**In re CASTLE VENTURES, LTD., Debtor.**

**Bankruptcy No. 191–13408–260.**

United States Bankruptcy Court, E.D. New York.

May 17, 1994.

---

Shaw, Licitra, Parente, Esernio & Schwartz by Eric Brown, Garden City, NY, for debtor.

Speno Goldman Goldberg Steingart & Penn, P.C. by Edward P. Frey, Mineola, NY, for applicant.

D'Amato, Forchelli, Schwartz, Mineo & Carlino by Jeffrey D. Forchelli, Mineola, NY, applicant.

Herrick, Feinstein by Andrew C. Gold, New York City, for F.D.I.C.

Office of U.S. Trustee by Alfred Dimino, Garden City, NY.

## DECISION ON FEE APPLICATION

CONRAD B. DUBERSTEIN, Chief Judge.

This matter comes before the Court on the fee application of D'Amato, Forchelli, Libert, Schwartz, Mineo, Laurino & Carlino ("DFL") as special counsel to Castle Ventures, LTD. (the "Debtor") seeking compensation and the reimbursement of expenses for work performed in connection with tax certiorari proceedings on behalf of the Debtor. Opposition to the fee application was interposed by the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver of American Savings Bank ("ASB"), the holder of a first priority mortgage encumbering one parcel of the Debtor's real property in the amount of $16,500,000. The funds available to pay DFL's fees are also the subject of a stipulation between ASB and the Debtor, which as more particularly set forth below, creates an interest in those funds in ASB. Insofar as there are insufficient funds with which to satisfy the interests of both DFL and the FDIC, this Court deemed this matter to be an adversary proceeding and reserved decision as to the distribution of the available funds.

## I. FACTS

The Debtor is a New York corporation with offices located at One Old Country

Road, Carle Place, New York (the "Carle Place Property"). Gary Melius ("Melius") is, and has been at all pertinent times, the President and Principal of the Debtor. The Debtor's business is the development, ownership, and management of its real property consisting of two parcels, the Carle Place Property and a second parcel located at 117 West 58th Street, New York, New York. The Carle Place Property is subject to the ASB mortgage referred to above.

In July of 1989, prior to the Debtor's Chapter 11 filing, DFL was retained by the Debtor to serve and file protests against the real estate tax assessments placed upon the Carle Place Property, as well as to initiate and prosecute claims for any resulting tax refund for the tax years 1989/90 and following. The written retainer agreement provided for a contingent fee in the amount of "33⅓ percent of all sums recovered or taxes saved as the result of any reduction in assessment by judicial determination or settlement." [1] The agreement further provided that DFL was authorized to retain its fees out of monies that came into its possession as a result of work done pursuant to the agreement. DFL commenced work which included the filing of tax certiorari petitions in New York State Supreme Court against the Nassau County Board of Assessors and the Board of Assessment Review, for the tax years 1989/90 and 1990/91.

On or about February 13, 1990, the Debtor borrowed the principal sum of $50,000 from Jack and Toby Libert[2] (the "Liberts") in return for a promissory note and mortgage on the Carle Place Property. Thereafter, on May 15, 1990, Melius, both individually and as President of the Debtor, executed a document ("the Assignment") assigning to the Liberts and Paul Malkin[3] ("Malkin") all right, title, and interest in the net proceeds of any judgment or settlement of the tax petitions as additional security for prepetition fees totalling $71,346.24[4] due DFL, and loans totalling $225,000 made to the Debtor by the Liberts and Malkin. The Assignment provided that simultaneously with its execution, a promissory note and mortgage in the principal sum of $50,000 was delivered to the Liberts, and the same in the principal sum of $125,000 was delivered to Malkin. The two loans to the Liberts were consolidated to form a single lien of $100,000 on the Carle Place Property.

On May 28, 1991, one year and two weeks after the Assignment was executed, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code"). An order of retention retaining DFL as special counsel to the Debtor with respect to the tax certiorari services was signed by this Court on May 31, 1991. DFL completed negotiations with the Nassau County Attorney's Office in June of 1991, settling the Debtor's tax certiorari petitions for the tax years 1989/90 and 1990/91, and approval was obtained from the Nassau County Board of Supervisors. Subsequently, in August of 1991, the Nassau County Supreme Court approved the settlement of the tax refund claims. The end result was a tax refund of approximately $324,932 of taxes already paid and a prospective tax savings of approximately $103,613 for the 1991/1992 tax year. The said sum of $324,932 was placed in an escrow account held by DFL for ultimate distribution in accordance with its rights thereunder.

The retention order authorizing DFL to assist the Debtor with its tax matters provided for a contingent fee, which was subject to later court approval upon proper application. However, such fee was not to exceed one-

---

1. *See* Retainer Agreement dated July 1989, annexed to DFL's Supplemental Affidavit in Support of Application for Allowance sworn to January 5, 1993.

2. Jack Libert is a member of the DFL firm.

3. Paul Malkin is Jack Libert's father-in-law.

4. This amount represents the amount owed to DFL for prepetition legal services that were unrelated to the tax certiorari petitions. However, by DFL's own admission, these fees were the result of legal services performed for the Debtor

and its principal Gary Melius. Moreover, a cursory glance at the statement of professional services rendered, annexed to DFL's fee application, reveals that most of these services appear to have been performed on behalf of Melius and not the Debtor. *See* Notice of Hearings on Applications to Confirm Settlement of Tax Claims, Approve Counsel Fees and Reimbursement of Expenses and to Authorize Payment of Settlement Proceeds [hereinafter Fee Application] at ¶ 14 page 6 and Exhibit D.

third of any recovery on behalf of the Debtor. The accompanying affidavit, required pursuant to the Code and the Federal Rules of Bankruptcy Procedure, stated that DFL did not

> have any connection with the Debtor, its creditors or any other parties in interest ... except that [DFL] is a prepetition *unsecured* creditor of the Debtor resulting from unpaid legal services rendered in connection with *unrelated* matters. Also, Jack L. Libert, a member of the firm, is a *secured* creditor of the Debtor to the extent of $100,000, which he personally loaned to the Debtor.[5] (emphasis added).

Neither the retention order nor its accompanying papers disclosed the Assignment. However, on October 29, 1991, the Liberts and Malkin filed with this Court proofs of claim, according to which the subject loans were secured by a mortgage on the Carle Place Property and "an assignment of proceeds of settlement of tax certiorari proceedings."[6] Additionally, the Debtor, as a claimant of the tax refunds, was required to and did file an affidavit with the Nassau County Treasurer as a precondition to disbursement of the refund. Such affidavit was executed by Melius and filed on or about November 6, 1991, with the Assignment annexed thereto. The affidavit provided that to the Debtor's knowledge, no other person, partnership or corporation had any interest in the tax proceedings, except for the Liberts and Malkin pursuant to the Assignment. Jack Libert and Paul Malkin as assignees signed the affidavit and consented to the Nassau County Treasurer's remittance of the refund to DFL as Debtor's attorneys.

During the course of the Debtor's Chapter 11, DFL filed the fee application presently pending before this Court seeking this Court's approval of compensation and the reimbursement of expenses for work performed in connection with the tax certiorari services performed on behalf of the Debtor. In addition, the fee application seeks this Court's authorization to pay to DFL the remaining settlement proceeds which were approved by Nassau County as set forth above, in accordance with the Assignment. Specifically, the fee application seeks approval to pay the $324,932 actually refunded, as follows: 1) $142,848 for the contingent fee of one-third of the Debtor's recovery based on the actual tax refund and prospective tax savings; 2) $400 for reimbursement of expenses related to the tax certiorari proceedings; and 3) $181,684 as and for payment to DFL, subject to payment by it to the Liberts, and Malkin to the extent of their interests pursuant to the Assignment.

Opposition to the fee application was interposed by the FDIC in its capacity as Receiver of ASB, which has been noted is the holder of the first mortgage affecting the Carle Place Property. The objection alleged, among other things, that the Assignment was not properly perfected. However, the gravamen of the FDIC's objection to DFL's fee application is its own interest in the tax proceeds pursuant to a stipulation between ASB and the Debtor, so ordered by this Court on March 9, 1992 ("Stipulation"), which provided, *inter alia*, that the

> Debtor shall remit to ASB $250,000 of the Tax Certiorari Refund immediately upon receipt of such funds by the Debtor. The remaining proceeds shall be available to pay the Debtor's administration expenses as approved by the Bankruptcy Court upon proper application.[7]

The Stipulation embodies an agreement between the Debtor and ASB whereby the Debtor agreed to pay to ASB $250,000 of the tax certiorari refund immediately upon its receipt by the Debtor, in exchange for the Debtor's use of cash collateral. The FDIC alleges that at the time of this agreement, the parties specifically intended that the $250,000 payment pursuant to the Stipulation was to reimburse ASB for a postpetition payment of real estate taxes made from ASB's cash collateral.

Sometime in August of 1992, DFL received a check in the amount of $45,609.32 which

---

5. *See* Retention Order dated May 31, 1991.

6. *See* Supplemental Affidavit in Support of Assignment sworn to November 23, 1992 at Exhibit D.

7. *See* Stipulation and Order Authorizing Limited Use of Cash Collateral and Providing Adequate Protection to ASB, "So Ordered" by this Court on March 9, 1992.

represented the Debtor's apportioned share of a settlement of tax certiorari proceedings instituted by the prior owner of the Carle Place Property for the 1988/89 tax year. This refund, like the $324,932 previously refunded, was also placed in escrow and held by DFL. On November 2, 1992, DFL sought to amend its fee application *nunc pro tunc* to also request a contingent fee of one-third of the $45,609.32.[8]

On December 10, 1992, this Court awarded DFL a contingent fee of one-third of $324,932, the actual tax refund, but because DFL did not render any services in connection with the refund for the 1988/89 tax year, this Court denied DFL's request for a one-third contingent fee based upon the $45,609.32. However, on April 1, 1993, this Court awarded DFL $34,537.63 as a one-third contingent fee based upon the Debtor's prospective tax savings of $103,613. Thus, DFL has been awarded contingent fees totalling $142,848.30 representing one-third of the amount actually refunded for the tax years 1989/90 and 1990/91 as well as one-third of the prospective tax savings.

On April 29, 1993, this Court signed an order directing DFL to pay to itself the outstanding balance of its said fees from the tax refunds it was holding in escrow provided that the balance of the tax refunds held was not reduced to less than $250,000. Said balance was to be held in an interest bearing escrow account subject to further order of this Court. Thus, of the contingent fees totalling $142,848.30 awarded and directed to be paid to DFL from the tax refunds it held in escrow provided that the balance of the tax refunds held was not reduced to less than $250,000, it appears that DFL has been paid approximately $120,541.32, leaving a balance of approximately $22,306.98 to be paid.[9] After payment of the foregoing, $250,000 plus accrued interest would remain in escrow. The FDIC claims $250,000 pursuant to the terms of the Stipulation. However, DFL wants to use the remaining escrow funds to pay to it the $22,306.98 together with the balance remaining pursuant to the Assignment, which would include the unrelated prepetition legal fees totalling $71,346.24 owed to DFL and the loans to the Liberts and Malkin totalling $225,000. It is abundantly clear that there are insufficient funds remaining in the escrow account with which to satisfy these claims.

After hearing all parties and having reviewed all of the facts, the testimony presented, and the papers submitted, for the reasons hereinafter set forth DFL's application is granted only insofar as it seeks this Court's authorization to pay to it the outstanding balance of its contingent fee award, amounting to $22,306.98, from the remaining escrow funds. After payment of the foregoing, the funds remaining in escrow are to be paid to the FDIC pursuant to the terms of the Stipulation.

## II. DISCUSSION

### A. *Prepetition Fees Totalling $71,346.24 Owed to DFL*

█ As part of its fee application DFL requests that it be allowed to pay to it from the settlement proceeds remaining in escrow the amount of $71,346.24. This is the amount DFL claims to be owed for prepetition legal work done on behalf of the Debtor and its principal Melius that was unrelated to the tax certiorari proceedings. In opposition to this request, the FDIC directs this Court's attention to the summary of professional services rendered which DFL appended to its fee application.[10] As the FDIC points out, this summary readily discloses that the prepetition legal services for which DFL seeks payment were performed in large part for the Debtor's principal, Melius and not for the

---

8. DFL acknowledged that Koeppel Martone Leistman & Herman rendered the services that resulted in the $45,609.32 refund. However, it contends that because the Koeppel firm did not receive any compensation for the recovery, "it is an additional sum arising from the proceeds of the tax certiorari proceeding, and [DFL] is entitled to one-third" of the $45,609.32. Response of DFL to Objections of FDIC, dated November 2, 1992, at ¶ 9.

9. There was approximately $370,541.32 held in escrow by DFL, consisting of the two separate tax refunds of $324,932 and $45,609.32.

10. *See* Fee Application at ¶ 14 page 6 and Exhibit D.

Debtor. In fact, the second item listed in the summary, a charge totalling $3,705.35 for the refinance of the Carle Place Property, is the only charge that clearly pertains to services performed on behalf of the Debtor. The remaining nine charges total $67,640.89 and from the brief description provided in the summary they appear to have been performed on behalf of Melius. Therefore any liability stemming from these charges would constitute a claim against Melius individually, and not against the Debtor's estate. Thus, it is abundantly clear to this Court that payment to DFL from the tax certiorari proceeds remaining in escrow for services performed by DFL on behalf of Melius is inappropriate. This conclusion is consistent with the fee application itself which recognizes that the $71,346.24 owed to DFL represents the "*unsecured* legal fees of the Debtor *and its principal Gary Melius.*"[11] Moreover, even if it could be demonstrated that these services were in fact performed on behalf of the Debtor, DFL's request for payment for these services from the escrow funds would still be denied because as DFL itself asserts, it is "a *prepetition unsecured* creditor of the Debtor" with respect to these fees.[12] Therefore, at best, DFL would be allowed a general unsecured claim against the Debtor's estate for the prepetition services performed on behalf of the Debtor in the sum of $3,705.35. Thus, for the foregoing reasons DFL's request for payment of $71,346.24 from the escrow fund for prepetition legal fees is denied. However, DFL is allowed a general unsecured claim representing the prepetition legal services performed on behalf of the Debtor.

## B. DFL's Contingent Fee

■ As detailed above, this Court has awarded DFL contingent fees totalling $142,-848.30 representing one-third of the amount

actually refunded for the tax years 1989/90 and 1990/91 and one-third of the prospective tax savings resulting from the tax services performed by DFL on behalf of the Debtor. Because of this Court's order directing DFL to pay to it the outstanding balance of its said fees from the tax refunds it was holding in escrow provided that the balance held was not reduced to less than $250,000, it appears that approximately $22,306.98 remains to be paid to DFL.[13] Therefore, DFL's application insofar as it seeks this Court's authorization to pay to it the outstanding balance of the fee award from the remaining escrow funds is granted to the extent of $22,306.98.

## C. The Assignment

As discussed above, opposition to DFL's fee application was interposed by the FDIC in its capacity as Receiver of ASB. The gravamen of the FDIC's objection to DFL's fee application is its own interest in the tax proceeds pursuant to the Stipulation between ASB and the Debtor. It is obvious that should this Court grant DFL's fee application *in toto*, the escrow funds would be exhausted thereby leaving nothing with which to pay the FDIC pursuant to the Stipulation, which provided, among other things, that the Debtor "remit to ASB $250,000 of the Tax Certiorari Refund immediately upon receipt of such funds by the Debtor."[14]

The FDIC contends that its interest in the $250,000 is superior to any interest pursuant to the Assignment because neither the Liberts nor Malkin validly perfected their interests in and to the refund. Specifically, the FDIC maintains that because a tax refund is a "general intangible" under section 9–106 of the Uniform Commercial Code ("U.C.C."), an assignment of such funds must be properly perfected by filing a financing statement[15] (a

11. *Id.* (emphasis added).

12. *See* Retention Order dated May 31, 1991 at page 5 (Affidavit of Special Counsel Pursuant to Section 327 and Bankruptcy Rules 2014 and 2016). *See also* Fee Application at ¶ 14 page 6 (stating assignment made "to DFL for unsecured legal fees").

13. *See supra* note 9 and accompanying text.

14. *See* Stipulation and Order Authorizing Limited Use of Cash Collateral and Providing Ade-

quate Protection to ASB, "So Ordered" by this Court on March 9, 1992.

15. "General Intangibles" are not listed in section 9–302 of the U.C.C. which provides that a financing statement must be filed to perfect all security interests except those listed. N.Y. U.C.C. LAW § 9–302 (McKinney 1990). Therefore, to perfect an interest in general intangibles requires the filing of a financing statement.

"UCC–1"), and because there was no such filing, the FDIC is entitled, over the claims of the Liberts and Malkin, to the $250,000 remaining in escrow. Thus, the U.C.C.'s classification of the security interest, may require that the Assignment be perfected in order to be considered superior to the FDIC's interest pursuant to the Stipulation.

However, DFL argues that the Assignment is excepted from the U.C.C.'s perfection requirements under section 9–104(f) which excludes from Article 9 any "assignment of accounts or chattel paper which is for the purpose of collection only...." N.Y. U.C.C. LAW § 9–104(f) (McKinney 1990).[16]

■ Section 9–106 of the U.C.C. provides in pertinent part that " 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money"[17] and it has already been established that section "9–106 of the U.C.C. extends the provisions of Article 9, including its perfection requirements, to general intangibles...." *Sarf v. Leff (In re Candy Lane Corp.)*, 38 B.R. 571, 576 (Bankr.S.D.N.Y. 1984). Moreover, despite DFL's arguments to the contrary, it is "settled law in this circuit that tax refunds are regarded as 'general intangibles' as that term is defined in New York Uniform Commercial Code § 9–106." *In re Tele/Resources, Inc.*, 21 B.R. 358, 362 (Bankr.S.D.N.Y.1982) (citing *Sterling Nat'l Bank & Trust Co. of New York v. Bornstein (In re Metric Metals Int'l, Inc.)*, 20 B.R. 633, 636 (S.D.N.Y.1981), *aff'd without opinion*, 697 F.2d 294 (2d Cir.1982)). In *Metric Metals*, the District Court for the Southern District of New York held that a tax refund constituted a general intangible. 20 B.R. at 636. There, the court observed that "the cases and commentators that have addressed the question agree that tax refunds constitute general intangibles as defined in the (Uniform Commercial) Code." *Id.; accord In re Don Connolly Constr. Co.,*

*Inc.*, 110 B.R. 976, 978 (Bankr.M.D.Fla.1990); *Lazere Fin. Corp. v. Palmetto Pump & Irrigation, Inc. (In re Palmetto Pump & Irrigation, Inc.)*, 81 B.R. 109, 111 (Bankr.M.D.Fla. 1987); *In re Neuenschwander*, 73 B.R. 327, 328 (Bankr.S.D.Fla.1987); *In re Kendrick & King Lumber, Inc.*, 14 B.R. 764, 766 (Bankr. W.D.Okla.1981). Thus, because tax refunds are general intangibles, the Liberts and Malkin would only be entitled to the tax refund pursuant to the Assignment if it was properly perfected when the Debtor filed its petition. *Neuenschwander*, 73 B.R. at 328.

■ In the instant matter, it appears that neither the Liberts nor Malkin ever filed a UCC–1 financing statement. Although the memorandum of law submitted to this Court by counsel for Jack Libert states that a UCC–1 financing statement was filed,[18] it does not state when or where and interestingly, no such document has been produced for this Court's examination. The Assignment itself, the proofs of claim, and the affidavit filed with the Nassau County Treasurer were the only documents submitted to this Court to prove the existence of a security agreement. Moreover, although the Assignment was annexed to the affidavit filed with the Nassau County Treasurer months after the commencement of the within Chapter 11 case, such filing was made as a pre-condition to the County's disbursement of the refund and is insufficient to perfect any interest in the tax proceeds pursuant to the Assignment. Under the U.C.C., because the Debtor does business in more than one county, a financing statement need be filed only with the New York Secretary of State to satisfy the filing required to perfect a security interest. N.Y. U.C.C. LAW § 9–401(c) (McKinney 1990). It has not been demonstrated to this Court that such filing occurred, therefore, the security interests of the Liberts and Malkin were never perfected.

---

**16.** U.C.C. § 9–104(f) states in pertinent part "[t]his article does not apply ... to an assignment of accounts or chattel paper." N.Y. U.C.C. LAW § 9–104(f) (McKinney 1990).

**17.** N.Y. U.C.C. LAW § 9–106 (McKinney 1990). The Official Comment notes "that this catch-all definition does not apply to money or to types of intangibles which are specifically excluded from

the coverage of the Article (Section 9–104)...." Section 9–104 does not specifically exclude tax refunds. N.Y. U.C.C. LAW § 9–104 (McKinney 1990 & Supp.1994).

**18.** *See* Memorandum dated April 16, 1993, submitted by Speno Goldman Goldberg Steingart & Penn, P.C., Attorneys for Jack Libert at page 6.

■ Although DFL argues that even if the nature of the Assignment did require its perfection, such perfection is excused because the Debtor and Debtor's counsel had actual notice of the Assignment prior to the execution of the Stipulation and the FDIC "was on notice" of the filed proofs of claim,[19] it has cited no law which supports this contention. However, section 544(a) of the Code, also referred to as the "strong arm" clause, allows a trustee in bankruptcy to avoid liens and security interests against the debtor's estate which were not properly perfected under state law prior to the debtor's bankruptcy filing. 4 Lawrence P. King et al., Collier on Bankruptcy, ¶ 544.01, at 544–3 to 544–4 (15th ed. 1992). It provides in pertinent part that:

(a) The trustee shall have, as of the commencement of the case, and *without regard to any knowledge* of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists[.]

11 U.S.C. § 544(a) (1994) (emphasis added). Thus, section 544(a) bestows upon the trustee or debtor-in-possession[20] the status of a judicial lien creditor *without notice*. *Id.* This status as a hypothetical lien creditor is frequently utilized to defeat unperfected security interests. Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual, ¶ 7.01, at 7–7 (3d ed. 1992).

Pursuant to Article 9 of the Uniform Commercial Code, a judicial lien creditor has priority over an unperfected security interest. As a result, the trustee may avoid a security interest that has not been properly perfected in accordance with the requirements of Article 9. If an unperfected security interest is avoided by the trustee,

the secured creditor loses the lien and is reduced to the status of a general unsecured creditor.

*Id.*

■ However, DFL maintains that pursuant to section 544, any failure to perfect the purported security interest renders the interest voidable by the trustee or debtor-in-possession rather than void, and thus, had the Debtor intended to avoid the Assignment for failure to perfect or for any other reason, it was required to take affirmative steps to do so and did not.

It is recognized that the avoidance powers of section 544 are generally only available to the trustee or debtor-in-possession. *See In re V. Savino Oil & Heating Co., Inc.,* 91 B.R. 655 (Bankr.E.D.N.Y.1988). And while it is true that no proceeding was ever instituted under section 544 to set aside or avoid the security interest claimed pursuant to the Assignment, this Court cannot ignore the fact that the Liberts' and Malkin's security interest was not properly perfected. *See Bank of California v. LMJ, Inc. (In re LMJ, Inc.),* 159 B.R. 926, 928–29 (D.Nev.1993).

"Avoiding unperfected liens benefits the entire estate of the debtor. The debtor, moreover, owes a fiduciary duty to the estate. Consequently, not only can the debtor seek to avoid unperfected liens regardless of the necessity of the avoidance, the debtor has an obligation to the estate to seek lien avoidance." *Edward Pirsig Farms, Inc. v. John Deere Co. (In re Pirsig Farms, Inc.),* 46 B.R. 237, 241 (D.Minn.1985). When an unperfected security interest is avoided by the trustee, the secured creditor loses the lien and is reduced to the status of a general unsecured creditor, which would undoubtedly benefit a debtor's estate. Thus, in light of the above, it is clear that in most instances a debtor-in-possession would bring an action to avoid an unperfected security interest whenever such avoidance is possible. However, in the instant situation, the Debtor's failure to institute such an action may stem from its desire to maintain a positive relationship with the creditors holding the unperfected security

19. *See* Response of DFL to Objections of the FDIC dated November 2, 1992, at page 10, ¶ 18.

20. With a limited exception, debtors-in-possession have all the rights of a trustee. 11 U.S.C. § 1107(a) (1994).

interest because not only did the Liberts and Malkin make significant prepetition loans to the Debtor but in addition, DFL's tax certiorari work resulted in a large benefit to the estate postpetition. Moreover, it is also quite possible the Debtor has other reasons for refraining from exercising its avoidance powers under the Code. However, because avoiding an unperfected security interest is beneficial to an estate, this Court will not disregard this Debtor's failure to exercise its avoidance powers.

■■■ It has already been recognized that "[t]o limit authority under any of the avoiding transfer concepts to an 'anointed' person such as a trustee or debtor is not compatible with the[ ] goals [of the avoiding transfer concepts]." *Xonics, Inc. v. E & F King & Co. (In re Xonics, Inc.)*, 63 B.R. 785, 788 (Bankr.N.D.Ill.1986). Moreover, a "bankruptcy court is a court of law as well as a court of equity, and the court may exercise broad, equitable powers provided the exercise of those powers is consistent with the Bankruptcy Code's provisions." *Hood v. Williams (In re Hood)*, 92 B.R. 648, 651 (Bankr.E.D.Va.), *aff'd*, 92 B.R. 656 (E.D.Va. 1988). So long as no specific provision of the Code is contravened, a bankruptcy court has the authority to take steps not specifically authorized by the bankruptcy laws "in furtherance of the goals of the [Bankruptcy] Code." *Rieser v. Landis & Gyr Powers, Inc. (In re Bownic Insulation Contractors, Inc.)*, 134 B.R. 261, 267 (Bankr.S.D.Ohio 1991); *Faircloth v. Bouchard (In re Int'l Gold Bullion Exchange, Inc.)*, 53 B.R. 660, 667 (Bankr.S.D.Fla.1985).

Specifically, section 105(a) provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. 11 U.S.C. § 105(a). "As courts of equity, bankruptcy courts must apply equitable principles and 'direct to be done that which ought to be done.'" *Braniff, Inc. v. GPA Group PLC (In re Braniff, Inc.)*, 118 B.R. 819, 841 (Bankr.M.D.Fla.1989) (quoting *In re Bronx–Westchester Mack Corp.*, 4 B.R. 730, 734 (Bankr.S.D.N.Y.1980)). Thus, this Court, not bound by the Debtor's inaction, may exercise its discretion to avoid the unperfected security interest *sua sponte* under section 105(a). *See Wonder–Bowl Properties v. Hi Ja Kim*

*(In re Kim)*, 161 B.R. 831 (9th Cir. BAP 1993) (raising 544 *sua sponte* to avoid judgment lien); *MacDonald v. Tack (In re MacDonald)*, 164 B.R. 325, 330 (Bankr.C.D.Cal. 1994) (raising 544 *sua sponte* to avoid execution sale).

Therefore, because the security interest was never perfected, it is void under section 544 of the Code pursuant to this Court's *sua sponte* exercise of its section 105 powers and the parties to the Assignment are thereby reduced to the status of general unsecured creditors.

*D. The Stipulation*

As discussed above the FDIC has an interest in the tax proceeds pursuant to the Stipulation between ASB and the Debtor, so ordered by this Court on March 9, 1992. Thus, after payment of the foregoing $22,306.98 to DFL, the funds remaining in escrow are to be paid to the FDIC pursuant to the terms of the Stipulation.

**III. CONCLUSION**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (K).

2. DFL's application insofar as it seeks this Court's authorization to pay to it the outstanding balance of the contingent fee award from the remaining escrow funds is granted.

3. After payment of the foregoing, the funds remaining in escrow are to be paid to the FDIC pursuant to the terms of the Stipulation.

4. DFL's application insofar as it seeks payment of $71,346.24 from the escrow fund for prepetition legal fees is denied.

5. DFL is allowed a general unsecured claim in the amount of $3,705.35 for the prepetition legal services performed on behalf of the Debtor.

6. The security interest in the Assignment is void under section 544 of the Code and the parties to it may file general unsecured claims as they may determine in such amounts arising from the Assignment, within

45 days of the entry of the order to be submitted consistent with this opinion.

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.