In re **SACRAMENTO REAL ESTATE CORPORATION, Sacramento Crushing Corporation, Sacramento Corporation, Debtors.**

**SACRAMENTO REAL ESTATE CORPORATION, Sacramento Crushing Corporation, and Sacramento Corporation, Plaintiffs,**

v.

**FIRST CHICAGO BANK, RAVENSWOOD, Defendant.**

**Bankruptcy Nos. 96 A 00394, 96 B 3992, 96 B 4120 and 96 B 4121.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 8, 1996.

Harold L. Moskowitz, Chicago, IL, for Plaintiffs/Debtors.

William L. Kabaker, Donald F. Engel, Schwartz & Freeman, Chicago, IL, for Defendant First National Bank of Chicago/Ravenswood.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

### Background

This Adversary proceeding[1] relates to bankruptcy proceedings filed by Sacramento Corporation ("Sacramento") and its subsidiaries, Sacramento Crushing and Sacramento Real Estate Corporation ("Debtors" or the "Sacramento entities") under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 101 *et seq.* The three bankruptcy proceedings have been substantively consolidated.

Sacramento Corporation holds all issued corporate stock of both Sacramento Crushing and Sacramento Real Estate. At the time of trial, Sacramento Crushing was in the business of recycling of construction waste. Sacramento Real Estate is in the business of owning and leasing the real estate upon which Sacramento Crushing operates. The defendant, First National Bank of Chicago as successor to First Chicago Bank/Ravenswood ("FNB" or the "Bank") is Sacramento's primary lender, secured by the real property

1. The Cook County Collector, originally made a party defendant, was dismissed on Plaintiffs' mo-

and improvements where the operations take place.

Debtors have filed this Adversary Complaint seeking declaration that a refund received from Cook County following tax litigation relating to real estate owned by Sacramento Real Estate (the "Refund") belongs to Debtors, not the Bank. Trial was held, and the Court now makes and enters Findings of Fact and Conclusions of Law, pursuant to which judgment will separately enter for the Plaintiff–Debtors.

### FINDINGS OF FACT

1. Sacramento Crushing Corporation ("Crushing"), an affiliate of Sacramento Real Estate Corporation ("Real Estate"), was at the time of trial in the business of operating a facility to recycle construction waste. Real Estate is in the business of owning and leasing of the real estate upon which Crushing operates. Real Estate is the sole beneficiary of National Boulevard Bank of Chicago Trust No. 8368, dated October 23, 1986 (the "Trust"). The Trust owns a certain parcel of real estate commonly known as 445 North Sacramento Avenue, Chicago, Illinois, which real estate consists of approximately 11 acres (the "Property").

2. On February 16, 1996, Real Estate filed its voluntary petition for reorganization relief under Chapter 11 of the Bankruptcy Code.

3. On February 20, 1996, Crushing filed a voluntary petition for reorganization relief under Chapter 11 of the Bankruptcy Code.

4. Debtors remain in control of their assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed.

5. First National Bank of Chicago ("FNB"), an Illinois banking corporation, is the successor corporation to the First Chicago Bank of Ravenswood f/k/a Bank of Ravenswood, an Illinois banking association.

6. On or about October 24, 1986, the Debtors and their parent company, Sacramento Corporation ("Sacramento"), pur-

tion on May 9, 1996.

chased all assets of Schreiber Material & Cartage Co., an Illinois corporation then in bankruptcy (the "Purchase"), from FNB pursuant to an Asset Purchase Agreement of that same date.

7. In order to fund the purchase, the Debtors, Sacramento, and John Gotta ("Gotta"), Sacramento's majority shareholder and President, executed and delivered the following promissory notes (the "Notes") to FNB:

a. A promissory note dated October 24, 1986, in the original principal amount of $1,418,000;

b. A promissory note dated October 24, 1986, in the original principal amount of $801,000;

c. A promissory note dated October 24, 1986, in the original principal amount of $721,000 (the "Advance Note"); and

d. A promissory note dated October 24, 1986, in the original principal amount of $250,000 (the "L of C Note").

8. To secure the obligations of Debtors to FNB (which as of October 24, 1986, totaled $3,190,000), Debtors executed and delivered a Security Agreement (the "Security Agreement"), dated October 24, 1986, in favor of FNB. In addition, Real Estate executed and delivered a mortgage on its major asset, which was the real estate commonly known as 445 North Sacramento Boulevard, Chicago, Illinois (the "Mortgage").

9. Pursuant to the terms of the Security Agreement, Sacramento granted FNB a continuing lien and security interest in the following personal property:

(a) All of Debtors' then-owned or thereafter acquired accounts receivable, contract rights, chattel paper, documents and instruments evidencing any obligations to Debtors for payment of goods sold or leased or services rendered, fixtures, furniture, and machinery and equipment and all proceeds and products thereof; and

(b) all present and future inventory of whatsoever kind or nature, including, without limitation, all raw materials, work in process and finished goods and any documents relating thereto, and all right, title, and interest of Debtors therein and thereto.

10. Debtors did not pay real estate taxes due and owing on the Property to the Cook County Collector for certain years. This resulted in the Cook County Collector's Office listing those real estate taxes for sale at its scheduled tax sale.

11. On March 20, 1992, the Cook County Collector sold the Property's 1987, 1989, and 1990 real estate taxes to Cambridge Investment Group ("Cambridge") and State Title, Inc. ("STI"), at the penalty rate of 18% every six months, the highest penalty rate permitted by law. (The tax parcels sold to STI were subsequently redeemed without contest and are not involved in the present dispute.)

On or about December 28, 1992, Crushing entered into an agreement with Cambridge pursuant to which Cambridge agreed to extend the time in which redemption of the tax liens sold to it could be made to December 1, 1993 (the "Redemption Agreement"). Neither the Debtors, JDG, Inc., nor John Gotta redeemed the real estate taxes pursuant to the Redemption Agreement with Cambridge.

12. Sacramento hired Robert Dempsey to represent it in redeeming the taxes and for all other related matters, including Cambridge's petition for tax deed. All of Dempsey's bills were sent to and paid by Sacramento.

13. Sacramento sought new monies from FNB to fund the redemption of taxes. At that point, FNB could have advanced such monies under its original mortgage. The Mortgage (wherein Boulevard National Bank, as Trustee, is identified as the "First Party"), provided in Paragraph 4 that the First Party "shall pay before any penalty attaches" all real estate taxes applicable to the Property. Paragraph 14 of the Mortgage also provided that the Mortgagee may, but was not required to, pay any tax lien affecting the Property. Paragraph 14 of the Mortgage further provided that any monies paid by the Mortgagee for the purposes authorized by Paragraph 14 and all expenses paid or incurred in connection therewith, including attorneys' fees and other monies advanced by the Mortgagee to protect the

Property and the Mortgagee's lien would constitute so much additional indebtedness secured by the Mortgagee.

14. However, FNB elected not to proceed by new advancement under the old Mortgage. On or about November 13, 1993, FNB granted Sacramento a new line of credit which was evidenced by the execution and delivery of a promissory note to FNB in the original principal amount of $625,000, the proceeds of which were to be used by Sacramento to redeem the unpaid real estate taxes. This line of credit was a new note and not an advance under any other or prior FNB/Sacramento loan document.

15. On or about November 30, 1993, the new loan amount was then credited to Sacramento's checking account, and cashier's checks totaling $662,539.66 on Sacramento's behalf were issued out of that account in favor of David Orr, the Cook County Clerk. On those checks, the listed remitter was Sacramento.

16. The total amount due to redeem all the real estate taxes that had been sold was found to be in excess of the new line of credit established in November of 1993, and additional authorization was needed to approve additional advance to Sacramento.

17. In order to pay the amounts needed to redeem from tax sales to STI and Cambridge, Sacramento was granted a larger line of credit by FNB, which was evidenced by the execution and delivery of a Demand Promissory Note dated February 11, 1994, in the original principal amount of $750,000, which loan amount was increased to the amount of $840,000 on or about March 15, 1994, pursuant to the terms of a new promissory note (the "New Note").

18. Terms of the New Note that covered the final total of the new loans provided that interest accrued and· was to be payable monthly at 1% over prime, and the Note was fully due in 90 days. Some interest was actually paid to FNB by Sacramento under the Redemption Note.

19. The New Note was renewed on June 15, 1994, and every 90 days thereafter until December 15, 1995.

20. All loan proceeds of the new loan were deposited into Sacramento's checking account. Cashier's checks were then issued out of that account payable to the Cook County Clerk, and the Debtors' checking account was then debited by the check amounts. These are the funds that were used to redeem from tax sales to STI (Finding No. 11) and Cambridge (Finding No. 17).

21. From the foregoing new loans, on or about February 2, 1994, some of the tax parcels sold to Cambridge were redeemed under protest by payment of $406,851.98 to the Cook County Collector, and on March 18, 1994, the remaining tax parcels were also redeemed under protest by payment of $411,-757.04 to the Cook County Collector.

22. In order to protect its interest in the Property, FNB executed the first of two Redemptions Under Protest certificates and deposited the certificate, together with a check in the amount of $406,851.98 from Debtor's newly borrowed funds, with the Cook County Collector. On March 18, 1994, FNB executed the second Redemption Under Protest certificate and deposited the certificate, together with another check from Debtor's newly borrowed funds in the amount of $411,762.04, with the Cook County Collector. All of the real estate tax liens against the Property, for the years 1987 through 1990 which had been previously sold to Cambridge, were thereby redeemed.

23. The two Redemption Under Protest certificates were executed by G. Joseph Keller, a vice-president of FNB. Both Redemption Under Protest certificates ·named FNB as the redeeming party, and the receipt for funds deposited with the Cook County Clerk specified that the funds were received from FNB. However, Sacramento's lawyer Dempsey saw to preparation and delivery of those papers and payments.

24. Cambridge then filed a Petition for Tax Deed as Case No. 93 CoTD 3536, bearing the caption *In The Matter Of The Application of the County Treasurer and Ex–Officio County Collector of Cook County, Illinois, for an Order of Judgment and Sale Against Lands and Lots; Petitioner Cambridge Investment Group* (the "Lawsuit").

25. Dempsey consulted with Sacramento and filed in Cambridge's two proceedings an appearance on behalf of FNB, the land trust holding legal title, and also Sacramento. In signing the protest papers, FNB was pursuing its interests to protect its collateral, and was thereby acting in accord with Debtors' parallel interests as well as its own.

26. The state court conducted a hearing on the Lawsuit and initially granted the petition of Cambridge for issuance of a tax deed. However, upon Motion to Reconsider, on January 19, 1996, the judge presiding entered a Memorandum Decision pursuant to which he reversed himself, finding that the sale of the delinquent taxes to Cambridge was completed contrary to the provisions of Section 21–205 of the Illinois Property Tax Code and thereupon sustained FNB's redemption under protest.

27. On February 13, 1996, a second Order was entered in the Lawsuit, finding that the sale of the real estate taxes to Cambridge was a sale in error pursuant to Section 22–45 of the Illinois Property Tax Code.

28. The February 13, 1996, Order further provided in pertinent part that Cambridge was to receive back only what it paid to buy the taxes, not interest thereon:

> As authorized by Section 21–380 of the Property Tax Code, the County Clerk shall forthwith pay to the party redeeming all funds presently on deposit on account of the redemption under protest for the sales of the 1990 taxes of the property described as Volume 544, P.I.N.'s 16–12–114–019 and 16–12–114–021 [the Permanent Index Numbers for the Property], including any interest earned on such deposits.

29. Accordingly, $315,793.34 (the "Overpayment") was returned to FNB as the "party redeeming," pursuant to check issued by the Cook County Clerk on February 23, 1996. However, the order made no finding as to what party owned the Refund.

30. The Refund check was actually received from the County Clerk either just before or just after the bankruptcy filings. FNB's name appeared on the Refund check issued by the Cook County Clerk as payee. By agreement of the parties in Debtors' related bankruptcy proceedings, the Refund was deposited into an interest bearing account pending further order of this Court. Since then, the only disbursement allowed from the Refund has been for fees the parties agreed were due to the attorney Dempsey.

31. Determining ownership of the Refund will affect the amount (or lack) of monies available to pay claims against the bankruptcy estate.

32. Additional facts stated in the Conclusions of Law will stand as further Findings of Fact.

### CONCLUSIONS OF LAW

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

■ Funds used to redeem the real estate taxes belonged to Sacramento. Although FNB loaned Sacramento those monies, the loaned funds were deposited into Sacramento's account without restriction. Sacramento then caused cashier's checks to be issued to redeem the real estate taxes.

Under 35 ILCS § 200/21–345, all redemptions from real estate tax sales are presumed to be by the property owner and inure to that party's benefit.

■ Under 11 U.S.C. § 541(a)(1), "property of the estate" in bankruptcy includes "all legal or equitable interests of the debtor in property." Such definition includes not only property that Debtor owned at the time of filing, but also property in which it had an interest, even if that interest is contingent. *Matter of Carousel Intern. Corp.*, 89 F.3d 359, 362 (7th Cir.1996). Actual possession of the property by debtor is unnecessary. *Matter of Pedersen*, 155 B.R. 750, 757 (Bankr. S.D.Iowa 1993). Moreover, the debtor's right to sue for any reason is a property interest that almost always becomes property of the estate. *In re FBN Food Services, Inc.*, 175 B.R. 671, 684 (Bankr.N.D.Ill.1994) (debtor's claims that were converted to settlement proceeds were property of the es-

tate), *aff'd*, 185 B.R. 265 (N.D.Ill.1995) *aff'd in part and remanded in part*, 82 F.3d 1387 (7th Cir.1996).

As discussed below, Debtors were entitled to the Refund on the bankruptcy petition date, and therefore held an interest in that property that was and remains property of the bankruptcy estate.

Section 9–106 of the Uniform Commercial Code provides in pertinent part that " 'General Intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." Section 9–106 of the Uniform Commercial Code also extends the provisions of U.C.C. Article 9, including, its perfection requirements, to general intangibles. *In re Castle Ventures, Ltd.*, 167 B.R. 758, 764 (Bankr.E.D.N.Y.1994).

██ The right to receive a tax refund is a general intangible. *Lazere Financial Corp. v. Palmetto Pump & Irrigation Inc. (Matter of Palmetto Pump & Irrigation, Inc.)*, 81 B.R. 109, 111 (Bankr.M.D.Fla.1987); *Sterling National Bank & Trust Co. of New York v. Bornstein (In re Metric Metals Int'l, Inc.)*, 20 B.R. 633, 636 (S.D.N.Y.1981); *In re Don Connolly Constr. Co., Inc.*, 110 B.R. 976, 978 (Bankr.M.D.Fla.1990); *Castle Ventures*, 167 B.R. 758 (real estate tax refund is a general intangible).

Because tax refunds are general intangibles, FNB would only be entitled to the Refund if general intangibles or choses in action were included in the Security Agreement that had been properly perfected by the time Debtors filed their respective bankruptcy petitions. *Castle Ventures*, 167 B.R. 758; *In re Neuenschwander*, 73 B.R. 327, 328 (Bankr.S.D.Fla.1987).

The Security Agreement executed by the Debtor, and as described in the U.C.C. Form–1 filed by FNB, did not include the granting of a security interest in general intangibles. Thus, FNB has never been granted (and even had it been granted, it has never perfected) a security interest in the Refund. The Refund is therefore an asset of the bankruptcy estate free and clear of any lien or encumbrance under the Security Agreement.

Further, even if the new loan of funds had been pursuant to the original mortgage described hereinabove, under the terms of that mortgage the collateral consisted only of the real estate and possibly collateral described in the Security Agreement. Since neither the mortgage nor the Security Agreement covered general intangibles or choses in action, FNB was not secured by the Refund or right to recover it.

FNB argues that Debtors did not have legal title to the refund at the time of the refund and this bankruptcy proceeding cannot help Debtors acquire legal title to the money. FNB argues that the Refund is not property of the estate under Title 11, U.S.C. § 541[2] and that it otherwise has a statutory and contractual right to it.

Debtors had the burden of proving that the Refund is property of the estate. *Gorenz v. State of Illinois Department of Agric.*, 653 F.2d 1179, 1184 (7th Cir.1981). The estate's rights are limited to whatever rights Debtors had at the commencement of the case and such rights are not expanded because of bankruptcy proceedings. *Matter of Sanders*, 969 F.2d 591, 593 (7th Cir.1992); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984). Section 541 expressly allows Debtor the right to "all legal or equitable interests of the debtor in property at the commencement of the case." As long as Debtor can show that it has a legal or equitable title in the refund at the commencement of the case, the refund is property of the estate.

---

**2.** Relevant parts of § 541(a) state:

(a) The commencement of a case under section 310, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case. . . .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

■ Whether a debtor has an interest in property is of course defined by state law, both to determine whether property is an asset of the debtor, *In re K & L Ltd.*, 741 F.2d 1023, 1030 n. 7 (7th Cir.1984); *In re Foos*, 183 B.R. 149, 157 (Bankr.N.D.Ill.1995); and to determine the nature of such rights, *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Matter of Jones*, 768 F.2d 923, 927 (7th Cir. 1985).

As stated, the right to receive a tax refund is a "General Intangible." The money returned here is much in the nature of a tax overpayment. The state court decided that the sale to Cambridge was a sale in error pursuant to § 22–45 of the Illinois Property Tax Code. As a result, the court ordered a refund of $315,793.34 from the full amounts paid by Debtors to redeem. This is very much like a tax refund for a tax overpayment. The right to receive a tax refund and the right to proceeds from litigating such a claim is a chose in action, therefore a "general intangible" right.

Because refunds are intangible, FNB would have had a security interest in the Refund only if its right to "general intangibles" or "choses in action" were included in the Security Agreement created for the purpose of giving FNB additional security for the money it lent for the purpose of tax redemption. *See Neuenschwander*, 73 B.R. at 327. Neither the original loan documentation nor documentation of the new loans that enabled tax redemption covered choses in action and proceeds thereof or even general intangibles. The litigation which resulted in the Refund enforced a chose in action and claim thereto which was held by Debtors prior to their bankruptcy filings. Moreover, the evidence showed no agreement between the parties which expressly allocated any possible refund to either party. Further, the Refund is not cash collateral as that term is defined under 11 U.S.C. § 363(a).

As a result, the Refund belongs to Debtor's estate.

■ FNB claims that it has a statutory right to the Refund irrespective of whether or not it contracted regarding disposition of the Refund or whether it had a security interest in such a refund granted by loan documentation. FNB claims to have been the "redeeming party" under Illinois law as defined by 35 ILCS 200/21–380. The relevant part of that statute states:

*Redemption under protest.* Any person redeeming under this Section at a time subsequent to the filing of a petition under 22–30 or 21–445, who desires to preserve his or her right to defend against the petition for tax deed, shall accompany the deposit redemption with a writing substantially in the following form: ... Redemption under protest constitutes the appearance of the person protesting in the proceedings under Section 22–30 through 22–55 and that person shall present a defense to the petition of tax deed at the time which the court directs ... Upon a finding sustaining the protest in the whole or in part, the court may declare the sale to be a sale in error under Section 21–310 or Section 22–45, and shall direct the county clerk to return all or part of the redemption money or deposit **to the party redeeming.**

35 ILCS 200/21–380 (emphasis added.)

FNB contends that it is a "redeeming party" because its name appears in on all the Redemption Certificates and on the Refund check issued by the Cook County Clerk. Thus FNB believes itself to be entitled to the funds because the state court ordered a refund under 35 ILCS 200/21–380 to the "redeeming party" and it claims to be that party.

The language of this Illinois statute cannot be interpreted to comprise a legislative decision that the "redeeming party" always has a property interest in a refund superior to all others. No case authority was found interpreting the statute in such manner. A better interpretation would interpret the phrase "to the party redeeming" to be an administrative provision directing disposition of a refund to that person whose name appears on the redemption certificate. Provision for the County Clerk to pay refunds to the "party redeeming" merely establishes the vehicle for the Clerk to be absolved of responsibility for those funds by paying them to a specified

party. The wording of the Illinois statute permits its application to situations where a refund made to the "party redeeming" is only held by that party in trust or as nominee for another who has a superior right to the money. The statute thus allows for the possibility that the "party redeeming" holds the refund in a resulting trust.

■ A resulting trust arises by operation of the law if one person furnishes consideration for property and title is taken in another. *Treschak v. Yorkville Nat'l Bank,* 237 Ill.App.3d 855, 857, 178 Ill.Dec. 558, 560, 604 N.E.2d 1081, 1083 (Ill.App.Ct.1992). The theory of a resulting trust is founded upon a natural equity that one who pays for the property should enjoy it, unless it was intended by the vesting of title to confer a beneficial interest upon the grantee. *Id.* (*citing Gary–Wheaton Bank v. Meyer,* 130 Ill. App.3d 87, 85 Ill.Dec. 180, 473 N.E.2d·548 (Ill.App.Ct.1984)). An implied or resulting trust imposed by operation of law arises when the transaction circumstances are such that it is inequitable for the title owner to enjoy a beneficial interest in the property, and such a trust arises from the presumed intent of the parties. *In re White Farm Equipment Co.,* 63 B.R. 800, 807 (Bankr. N.D.Ill.1986), *aff'd, Brinkmann v. White Farm Equipment Co. (In re White Farm Equipment Co.),* 1987 WL 4838 (N.D.Ill. May 4, 1987). Resulting trusts arise most commonly in "straw man" real estate transaction where title is taken by one person after consideration for the purchase is provided by another.

■ In Illinois, the person claiming that a resulting trust exists must establish the existence thereof by clear and convincing evidence. ·Once claimant shows that it provided the payment from which the property in issue was deemed, a rebuttable presumption of resulting trust arises and the burden shifts to the other party to prove entitlement. *American Nat'l Bank and Trust Co. of Rockford, Ill. v. United States,* 832 F.2d 1032, 1035–1036 (7th Cir.1987); *Zack Co. v. Sims,* 108 Ill.App.3d 16, 27, 63 Ill.Dec. 732, 740, 438 N.E.2d 663, 671 (Ill.App.Ct.1982). Here, Debtors have shown that they borrowed money without restriction for use in redeeming taxes. FNB did not prove otherwise.

Because the Refund returned Debtors' money that was used to redeem the taxes, and because there was no agreement between the parties giving FNB a security interest therein, FNB is therefore deemed to hold the Refund as trustee of a resulting trust for the benefit of the Debtors. Since Debtors' funds were used to redeem the taxes, any benefit accruing from that redemption through a refund belongs to Debtors.

FNB argues that Debtors never had a property right in the $850,000 used to redeem the taxes, claiming that the Bank's money was used to redeem the taxes, and therefore no resulting trust. could arise. However, the facts established at trial indicate that, although FNB signed the redemption certificate and was the "party redeeming" under 35 ILCS 200/21–380, it was Debtors' borrowed money that was used for the redemption.

Quite clearly, the funds used to redeem the taxes had been loaned to Debtor. Those funds were not advanced under the old Mortgage. Rather, Debtor gave new consideration for these new funds in the form of new promissory notes. New security agreements were issued to cover the new indebtedness, albeit not drafted with adequate scope to cover the refunded fund involved here. The new loans were deposited in Sacramento's bank account before the checks were issued. Furthermore, the checks used to redeem real estate taxes listed Sacramento Crushing as "Remitter," and Debtors paid interest on the newly borrowed funds. In short, FNB clearly loaned the money to Debtors through new loans and sufficiently documented the transactions to create a new debtor-creditor relationship.

The fact that the parties understood the funds were loaned for the purpose of redeeming real estate taxes does not change ownership of the loaned funds or create a lien on the partial refund thereof. The intended use of funds did not change the debtor-creditor relationship, and did not create a lien on choses in action or general intangibles.

There was some evidence at trial that FNB had reason to anticipate a possible partial refund of the redemption payments. First, FNB suggested to Debtors' president that he hire Dempsey, an attorney experienced in property tax matters, to represent Debtors in the state tax litigation. There was also a November 19, 1993, interoffice memorandum from Mr. Keller, Vice–President of FNB (over two months prior to the redemption), noting that "there appeared to be some irregularities in the dates and numbering sequence of the certificates purchased by Cambridge." The memo also noted that "[t]hese irregularities have been confirmed by a real estate tax attorney hired by Sacramento who plans to file a motion for a restraining order to prevent Cambridge from filing for deed...." Therefore, an FNB officer knew that part of the new money to be loaned out for Debtors to use in real estate tax redemptions might be returned because of sale irregularities. However, FNB did not draft the new loan documentation to provide that any such refund would be returned to FNB, nor did it extend its lien rights to choses in action or intangibles owned by Debtors so as to cover such a possible refund. Those agreements cannot be rewritten here to correct the Bank's omission at the time to protect its interests.

## CONCLUSION

Accordingly, judgment will separately enter declaring the Refund to be property of the bankruptcy estate of these Debtors and ordering turnover of it to a debtor-in-possession account subject to further order of Court.