**In re Q–C CIRCUITS CORP., Debtor.**

**United States of America, Plaintiff,**

v.

**National Westminster Bank USA and Q–C Circuits Corp., Defendants.**

CV 97–0674.
Bankruptcy No. 089–71351–511.
Adversary No. 092–7035–511.

United States District Court,
E.D. New York.

April 8, 1999.

Zachary W. Carter, United States Attorney, Eastern District of New York, by Stephen J. Riegel, Assistant United States Attorney, Brooklyn, New York, for plaintiff-appellee/cross-appellant United States.

Winston & Strawn, by N. Theodore Zink, Jr., Leslie S. Gold, New York City, for defendant-appellant/cross-appellee National Westminster Bank USA.

Phillips, Nizer, Benjamin, Krim & Ballon, by Louis Scarcella, Garden City, New York, for debtor Q–C Circuits Corp.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an appeal from a judgment of the bankruptcy court (Cyganowski, B.J.) granting summary judgment to the United States of America (the "Government") in an adversary proceeding commenced by the Government against National Westminster Bank USA ("NatWest").[1] For the reasons set forth below, the grant of summary judgment is affirmed. The order of the bankruptcy court is modified, however, as detailed below, to provide for an award of prejudgment interest to the Government.

## BACKGROUND

The adversary proceeding that is the subject of this appeal arises out of Chapter 7 bankruptcy proceedings involving Q–C Circuits Corp. ("Q–C" or the "Debtor"). The Government commenced the adversary proceeding seeking the disgorgement by NatWest of cash collateral payments made by the Debtor during the time that it was a debtor-in-possession and continuing to carry on its business. The Government also sought disgorgement of funds paid to NatWest as a result of the sale of certain of the Debtor's property and of cash spent by the Debtor to prepare certain real property for sale.

*The IRS Lien And The NatWest Lien*

The Government's claim arises out of a tax lien asserted by the Internal Revenue Service ("IRS") in the amount of $249,930.53. The IRS properly perfected this lien by filing its "Notice of Federal Tax Lien Under Internal Revenue Laws" with the Secretary of the State of New York in Albany on July 7, 1989. Thereafter, on November 29, 1989, Q–C filed a voluntary petition for bankruptcy. On March 22, 1990, the IRS filed proof of its claim in the amount of $290,433.92 which amount reflected the original tax lien plus interest and penalties. As of the date of the

petition, Q–C was indebted to NatWest in the amount of approximately $5 million. NatWest's security interests in Q–C's property were perfected prior to the filing of the tax lien.

*The Debtor's Use Of Cash Collateral*

On the date of the bankruptcy filing, Q–C moved for an order authorizing it to use "cash collateral" funds to continue the operation of its business. On that date, the bankruptcy court authorized the use of $50,000 of cash collateral pending a hearing scheduled for December 5, 1989. It is undisputed that the IRS received notice of this initial application and of the December 5, 1989 hearing. At the December 5 hearing, which the IRS did not attend, counsel for the Debtor represented to the court that the IRS asserted a pre-petition tax lien and that the Government did not object to the Debtor's use of cash collateral so long as the IRS was granted a replacement lien in the same amount and of the same priority as its pre-petition lien.

At a hearing held on December 19, 1989 (of which the IRS indisputably had notice) the bankruptcy court issued an "Interim Consent Order," authorizing the additional use of cash collateral by the Debtor not to exceed $496,000 pending a final hearing. As adequate protection to both NatWest and the Government, for the use by the Debtor of cash collateral, the bankruptcy court granted NatWest and the IRS replacement liens in Q–C's post-petition inventory and accounts receivable in the same priority as previously asserted liens. As further adequate protection to NatWest, the Bankruptcy Court ordered that the Debtor deliver to NatWest a mortgage against real property occupied by the Debtor located in Amityville, New York (the "Amityville Property"), in an amount not to exceed the actual diminution in the value of the cash collateral due to the debtor's use of cash collateral.

On January 4, 1990, the bankruptcy court entered a "Second Interim Consent Order" authorizing the use by the Debtor of approximately $800,000 in cash collateral. Like the first Interim Consent Order, this order granted the IRS and NatWest replacement

---

1. National Westminster Bank USA is currently known as Fleet Bank, NA. For the purposes of

this opinion, the court will refer to National Westminster Bank as "NatWest."

liens and again, granted NatWest a mortgage on the Amityville Property. The IRS was not provided with a copy of the January 4, 1990 order.

Hearings were thereafter held at the bankruptcy court on January 30, February 6, February 8 and March 1, 1990. At the March 1, 1990 hearing the bankruptcy court approved the "Third Interim Consent Order." This order authorized the use of cash collateral in the amount of $532,000 for the period February 1, 1990 through and including March 1, 1990 for the operation of the business of the Debtor. This order granted replacement liens to NatWest and the IRS and retroactively approved of $35,000 in cash adequate protection payments made to NatWest by the Debtor. Like the earlier consent orders, the Third Interim Consent Order granted NatWest a mortgage against the Amityville Property It is not disputed that the IRS did not receive notice of the January 30, February 6, February 8, 1990 or the March 1, 1990 hearing or order.

On April 16, 1990, the bankruptcy court entered a "Consent Order Authorizing The Use Of Cash Collateral And Providing Adequate Protection." This order authorized Q–C to use cash collateral for the period of March 1, 1990 through August 30, 1990 in an amount not to exceed $3.3 million. The IRS and NatWest were again granted replacement liens. Additionally, the April 16, 1990 Order required the Debtor to make adequate protection payments to NatWest on a weekly basis. These payments aggregated $227,-439.72. At that time, the bankruptcy court also authorized the Debtor to deliver to NatWest a fourth mortgage, in the amount of $750,000, on the Amityville Property. The parties do not dispute that the IRS did not receive notice of the April 16, 1990 hearing or order.

As a consequence of the above-referenced orders of the bankruptcy court, NatWest received $35,000 (during February of 1990) and an additional $166,205.92 in adequate protection payments from the Debtor from March of 1990 through July of 1990. Thus, as of July 1990, NatWest received a total of $201,-205.92 in adequate protection payments from the Debtor. Although the consent orders consistently granted the IRS replacement liens, the Government was never granted any adequate protection payments.

*Sales Of The Debtor's Property*

In September of 1990, the bankruptcy court scheduled a hearing to approve of the proposed sale of certain of the Debtor's property. While the notice stated that the property would be sold free and clear of all encumbrances, it did not specify the entity that would receive the proceeds of the sale. The IRS received this notice and did not oppose the sale. On October 18, 1990, the bankruptcy court issued an order approving of the proposed sale referred to in the September notice. The October 18 order further provided that the Debtor would pay to NatWest the net proceeds of the sale. The IRS did not receive notice of the October 18, 1990 order. On December 12, 1990, the sale of the Debtor's equipment took place and NatWest thereafter received the net proceeds thereof which amounted to $15,490.

*Preparation And Sale Of The Amityville Property*

Between August of 1990 and July of 1991 the Debtor used cash collateral to prepare the Amityville Property for sale. Of these funds, $174,961 was expended for the physical clean-up of the premise and the remainder was spent on environmental clean-up. In a letter dated November 7, 1990, the Debtor confirmed a conversation with NatWest regarding the use of cash to prepare the Amityville Property for sale. That letter stated that the IRS lien had the priority interest in the money used for the clean-up and if there were no other assets from which to pay the IRS lien, NatWest will disgorge such funds to the IRS.

*The Adversary Proceeding*

The Government commenced its adversary proceeding in the bankruptcy court on February 27, 1992. The proceeding set forth four separate causes of action. The first cause of action sought an order declaring that the IRS tax lien had priority over the Debtor's assets superior to that of NatWest's security interest. The second cause of action sought an order requiring NatWest to account for and disgorge those assets in satis-

faction of the tax lien. In its third cause of action, the IRS alleged that it had not received notice of the interim or final consent orders regarding the use of cash collateral, including the final consent order's provision of weekly adequate protection payments to be made to NatWest. Accordingly, the third cause of action sought an order declaring that transfer of the debtor's assets to Nat-West pursuant to the consent orders to be null and void and directing that NatWest disgorge such assets. In the fourth cause of action, the IRS alleged that it did not receive proper notice of the use of the Debtor's assets to clean-up the Amityville property in preparation for its sale and sought an order declaring the use of funds for this purpose to be null and void and to direct disgorgement of such assets. In May of 1993, the Government moved for summary judgment in the adversary proceeding. The Government's motion was not opposed by the Debtor.

*The Bankruptcy Court's Decision*

In a decision dated October 15, 1996, the bankruptcy court rendered an opinion (the "Decision") granting the Government summary judgment on the first, second and third causes of action and partial summary judgment on the fourth cause of action. The Decision held that the IRS lien on pre-petition property had priority over the Nat-West's security interest on Q–C's accounts receivable and inventory as to all accounts receivable and inventory received by the Debtor after September 14, 1989.

The court further found that the cash collateral orders and adequate protection payments made to NatWest and the payments made to NatWest following the auction sale were made from assets as to which the IRS had an interest superior to that of NatWest. The Decision held that the IRS was entitled to an accounting of funds transferred to Nat-West and an order directing that they be disgorged and turned over to the extent necessary to pay the tax lien. The Decision states that the IRS did not receive sufficient notice of the adequate protection payments made to NatWest under the cash collateral orders or the order authorizing the auction sale. Accordingly, the court held that the IRS did not consent to such relief and did

not waive its rights to object thereto. The Decision further held that the IRS was entitled to interest on the amount claimed because at the time of the filing of the lien, it was oversecured.

Finally, with respect to the fourth claim for relief—seeking disgorgement of all funds expended by the debtor to prepare the Amityville Property for sale, the Decision granted the IRS partial relief. Specifically, the Decision held that the IRS was entitled to summary judgment with respect to that portion of the assets used for the physical clean-up of the Amityville Property. According to the Decision, this portion of the assets was clearly spent at the direction of NatWest. The bankruptcy court declined to grant the government summary judgment with respect to that portion of the assets used for environmental clean-up of the Amityville Property. Since this environmental clean-up was required by law, the Decision held that a question of fact existed as to whether assets spent on the environmental clean-up of the Amityville Property were expended at the direction of NatWest (in which case they would have been ordered disgorged) or to comply with New York State Law (in which case disgorgement would not follow).

*The Bankruptcy Court's Final Order*

Following the rendering of the Decision, the parties submitted orders for entry. The Government submitted an order requiring NatWest to disgorge to the Government "the amount of … transferred assets necessary to satisfy the current amount of the Tax Lien, which, including interest from the date of the filing of the petition until November 30, 1996, totals $520,728.72." The Government's proposed order further noted that partial summary judgment in the amount of $174,961 was granted with respect to the fourth cause of action and declared that the Government had a priority claim to the Debtor's assets in that amount and ordering Nat-West to disgorge to the Government any amount up to that sum necessary to fully satisfy the outstanding current value of the tax lien.

NatWest objected to the Government's proposed order and submitted a counter proposed order. NatWest's order noted that

the Decision stated that NatWest was directed to disgorge to the IRS funds totaling $216,695.92, such sum reflecting improper cash collateral payments made to NatWest of $201,205.92 and $15,490, reflecting the payment made to NatWest as a result of the auction of some of the Debtor's property. The NatWest order further ordered the Bank to disgorge the amount spent on physical clean-up of the Amityville Property— $174,961. Adding these sums together, NatWest's order provided that NatWest would pay to the government the total sum of $391,656.92.

On November 14, 1996, the bankruptcy court signed NatWest's proposed order. NatWest appeals the grant of summary judgment. The Government seeks affirmance of summary judgment but appeals the bankruptcy court's denial to enter the order requiring payment of the full $520,728.72 sought in its proposed judgment.

## DISCUSSION

### I. General Principles

#### A. Standard Of Review

■■■ On appeal, the Bankruptcy Court's findings of fact may be set aside only if they are clearly erroneous. Conclusions of law are subject to *de novo* review. Fed. R.Bankr.P. 8013; *Truck Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 88 (2d Cir.1987); *In re Luthra*, 182 B.R. 88, 91 (E.D.N.Y.1995). An award of prejudgment interest is reviewed according to an abuse of discretion standard. *See In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir. 1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994); *In re Southland & Keystone*, 132 B.R. 632 (9th Cir. BAP 1991).

#### B. Priority of the IRS Lien

The parties do not dispute the general principle giving the IRS lien priority over the security interest of NatWest. It is clear that the tax lien had priority over the security interests of NatWest over the Debtor's accounts receivable and inventory generated after September 14, 1989. The September 14 date reflects the 45 day "safe harbor provision" of 26 U.S.C. § 6323(c) following filing of the tax lien.

#### C. The Use of Cash Collateral And Provisions For "Adequate Protection"

11 U.S.C. § 363 allows a trustee or debtor in possession to use "cash collateral" under certain specific circumstances. "Cash collateral" includes, *inter alia*, cash and cash equivalents in which the estate "and an entity other than the estate" (such as a creditor) has an interest. 11 U.S.C. § 363(a). The debtor may use cash collateral to continue its business operations if each entity having an interest in the cash collateral consents or the court, "after notice and a hearing" authorizes such use. 11 U.S.C. § 363(c)(2).

■■ When cash collateral is used by the debtor, the bankruptcy court has the discretion to provide for "adequate protection" to those entities having an interest in the cash collateral. 11 U.S.C. § 363(e). The court may order the granting of replacement liens and may also require that cash payments be made to such entities.

### II. Review Of The Bankruptcy Court's Decision

#### A. Notice To The IRS Of The Cash Collateral And Adequate Protection Payment Orders

In view of the foregoing, it is clear that the bankruptcy court had the power and discretion to allow the Debtor to use cash collateral. It is also clear that the bankruptcy court was well within its powers when, as adequate protection, it granted replacement liens and allowed the Debtor to make cash payments. To be upheld on appeal, however, the orders must have been predicated upon the consent of all parties with an interest in the cash collateral or, after notice and an opportunity to be heard. *See* 11 U.S.C. § 363(c)(2).

Here, although each of the so-called "consent orders" authorizing the use of cash collateral and the making of payments to NatWest recited that they were issued after notice to the IRS, it is without dispute that certain of these orders were issued without notice to the IRS. Thus, while the IRS had notice of the November 29, 1989 initial appli-

cation to the bankruptcy court and of the December 5, 1989 and December 19, 1989 hearings, the Government received no notice of the January 4, 1990 Second Interim Consent Order. Nor did the IRS receive notice of the January 30, February 6, February 8 and March 1, 1990 hearings or of the March 1, 1990 Third Interim Consent Order, or of the April 16, 1990 final consent order.

It is similarly without dispute that the IRS received no notice that the proceeds of the December 12, 1990 sale of certain of the Debtor's property would be paid to NatWest. While it is true that the IRS received the October 18, 1990 notice advising that the sale would take place, this notice made no mention that the proceeds of the sale would go to NatWest. Finally, the Government was not advised of the use of cash collateral to prepare the Amityville Property (which was heavily encumbered by NatWest's mortgages) for sale.

■ There is no doubt that both the Bankruptcy Code and due process required that the Government, as a senior lienholder whose interests were clearly affected by the Debtor's use of cash and its payments to NatWest, was required to be given notice and an opportunity to be heard regarding each consent order. 11 U.S.C. § 363(c)(2); see In re Ex–Cel Concrete Co., 178 B.R. 198, 202–05 (9th Cir. BAP 1995); In re Center Wholesale, Inc., 759 F.2d 1440, 1448–50 (9th Cir.1985). Where a creditor is not given notice, or the notice given is inadequate, the court may set aside the cash collateral order and order disgorgement of funds. See, e.g., Center Wholesale, 759 F.2d at 1448–50 (setting aside cash collateral order where creditor received stipulation only one day prior to hearing and stipulation was unclear as to whether creditor's lien would be affected).

■ The court rejects the arguments raised by NatWest that the Government was under some type of obligation to monitor this case and determine whether the court had

issued orders subsequent to the order of which it had notice. Having received notice of the initial activity in the bankruptcy court, the Government was properly under the impression that it would be advised of further activity. The mere knowledge of a bankruptcy and reorganization has not been held to impose some type of "inquiry notice" upon a creditor See City of New York v. N.H. & H.R. Co., 344 U.S. 293, 297, 73 S.Ct. 299, 97 L.Ed. 333 (1953) (New York City's knowledge of bankruptcy and reorganization does not impose a duty to inquire about possible court orders).

NatWest's reliance on In re Sam, 894 F.2d 778 (5th Cir.1990), is misplaced. There, the court held that the creditor was not entitled to separate notice of the claims bar date because the setting of that date is not within the discretion of the court but, instead, takes place by operation of statute, within sixty days of the first date set for the meeting of creditors—a date of which the creditor was well aware. Id. at 781; see also In re Medaglia, 52 F.3d 451, 454–57 (2d Cir.1995) (holding that actual knowledge of petition may substitute for formal notice of claims bar date). In any event, Sam involved section 523 of the Bankruptcy Code and not section 363 which expressly provides for notice and an opportunity to be heard prior to the Debtor's use of cash collateral or the making of adequate protection payments. Where, as here, hearings were held that were not required by statute to be held on dates certain, the creditor is undoubtedly entitled to the notice set forth by the Supreme Court in City of New York.[2]

Finally, the court rejects the argument that factual issues precluded the grant of summary judgment. According to NatWest, even assuming the IRS lacked notice, a genuine issue of material fact existed as to whether having been given the proper notice, the IRS would have objected and, upon objection, its objection would have been sustained. The material fact in this case was whether or

2. In re Byrd, 94 B.R. 458 (Bankr.S.D.Ohio 1988). L.F. Rothschild & Co., Inc. v. Angier, 84 B.R. 274 (D.Mass.1988) and In re Siouxland Beef Processing Co., 55 B.R. 95 (Bankr.N.D.Iowa 1985), each of which are relied upon by NatWest to impose on the IRS a duty to inquire are factually distin-

guishable. None of these cases involved proper initial notice of the use of cash collateral followed by additional cash collateral use and adequate protection payments without additional notice.

not the IRS was given adequate notice of the various orders of the bankruptcy court. It is without doubt that no such notice was given. There can be no doubt that, had the proper notice been given, the IRS would have objected and, as noted above, there is equally no doubt that the IRS lien had priority over the security interests of NatWest. Accordingly, the court holds that no issue of material fact precluded the grant of summary judgment herein.

In view of the foregoing, the court affirms the bankruptcy court's finding that the Government did not receive notice of the orders of January 4, 1990, March 1, 1990 and April 16, 1990. The court further affirms the finding that the Government was not put on notice that the proceeds of the December 12, 1990 sale of the Debtor's property would be paid to NatWest or of the use of cash collateral to prepare the Amityville Property for sale. Accordingly, the court affirms the grant of the Government's motion for summary judgment on the first, second and third causes of action and the grant of partial summary judgment as to the fourth cause of action.

### B. *The Denial Of Interest*

■ As noted above, the parties submitted competing orders for entry after the Decision. NatWest's order requirement payment to the IRS of a total of $391,656.92. This order reflects an aggregation of the following three amounts: (1) $201,205.92 received by NatWest as adequate protection payments made through July 1990; (2) $15,490 received by NatWest as the proceeds of the December 12, 1990 sale of certain of the Debtor's property, and (3) $174,961 of cash collateral expended by the Debtor for the physical clean-up of the Amityville Property in preparation for sale. NatWest's proposed judgment contained no provision for the payment of interest.

The Government presented an order providing for the payment by NatWest to the IRS of $520,728.72. The amount sought by the IRS represented the amount of the IRS claim for its tax lien at the time of the bankruptcy petition plus interest up until the time of the proposed order.

As noted above, the Bankruptcy Court found that because at the time of its filing, the lien was oversecured by post-petition accounts receivable and inventory, the IRS was entitled to post-petition interest pursuant to 11 U.S.C. § 506(b). Although the Decision noted the Government's entitlement to post-petition interest, the judgment of that court does not note this entitlement. Rule 8013 of the Federal Rules of Bankruptcy Procedure gives this court the power, *inter alia*, to modify the order of the bankruptcy court. In accord with that power, this court holds that the judgment of the bankruptcy court should be amended to reflect the Decision's holding that the Government was entitled to pre-petition interest on its tax lien. This, however, does not fully resolve the question of the amount due to the Government.

NatWest argues, properly, that the post-petition interest to which the Government was entitled was a payment that was required to have been paid by the Debtor. NatWest further argues that because only the Debtor was required to pay interest to the IRS the bankruptcy court could not have ordered NatWest to pay any interest to the Government. Even assuming, however, that the post-petition interest was properly paid only by the Debtor, does not preclude an award of interest to the Government.

■ NatWest ignores that the bankruptcy court is a court of equity that is free to impose orders to provide whatever relief is necessary to effectuate complete justice under the circumstances. *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *In re Castle Ventures, Ltd.*, 167 B.R. 758, 766 (Bankr.E.D.N.Y.1994). Section 105(b) of the Bankruptcy Code which authorizes the bankruptcy court to issue any order that is "necessary or appropriate to carry out the provisions" of the code, is to be construed liberally. *Momentum*, 25 F.3d at 1135.

■ An award of prejudgment interest is similarly within this court's broad discretion. The factors influencing the exercise of this discretion include: (1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the

**514**

statute involved, and/or (4) such other general principles as are deemed relevant by the court. *Wickham Contracting Co. v. Local Union No. 3, Intern., Broth. of Electrical Workers,* 955 F.2d 831, 833 (2d Cir.), *cert. denied,* 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). Where, as here, one creditor has had the use of funds that should have been paid to other claimants it has been held that prejudgment interest is proper. *In re Southland & Keystone,* 132 B.R. 632, 641 (9th Cir. BAP 1991).

Here, NatWest has had the value of funds received from the Debtor since 1990 and 1991. Because of the priority of the tax lien, these are funds that should have been available to the Government over the last eight or nine years. If the Debtor had been ordered to make payments to the IRS (as it was ordered to make to NatWest), the tax lien would have long ago been satisfied. Under these circumstances the court holds that the Government is entitled to an amount sufficient to satisfy the outstanding tax lien including interest.

### CONCLUSION

The decision of the bankruptcy court granting the Government's motion for summary judgment on the first, second and third causes of action and partial summary judgment on the fourth cause of action is affirmed. The judgment of the bankruptcy court dated November 14, 1996 is modified to provide that the Government is entitled to an award of post-petition interest. The court further holds that the Government is entitled to an award of pre-judgment interest in an amount necessary to satisfy its tax lien plus interest. The Government shall submit an order, on notice, effectuating the provisions of this Memorandum and Order.

SO ORDERED.