In re NEMKO, INC., Debtor.

The Chase Manhattan Bank,
N.A., Plaintiff,

v.

Nemko, Inc., debtor and debtor-in-pos-
session, and Summit Bank, f/k/a Unit-
ed Jersey Bank, Defendants.

Bankruptcy No. 190–11025–260.
Adversary No. 191–1110–260.

United States Bankruptcy Court,
E.D. New York.

Nov. 23, 1999.

Chadbourne & Parke LLP, by Howard Seife, New York City, for plaintiff/The Chase Manhattan Bank.

Satterlee Stephens Burke & Burke LLP, by Christopher R. Belmonte, New York City, for defendant/Summit Bank.

## DECISION ON PLAINTIFF CHASE MANHATTAN BANK'S MOTION FOR SUMMARY JUDGMENT

CONRAD B. DUBERSTEIN, Chief Judge.

## MEMORANDUM OPINION

This is a motion for summary judgment on the issue of prejudgment interest. The motion is granted.

## PROCEDURAL BACKGROUND [1]

Plaintiff, The Chase Manhattan Bank, N.A., ("Chase"), instituted the within adversary proceeding on March 11, 1991 against Defendant, United Jersey Bank ("UJB"), the predecessor of Summit Bank, ("Summit"), and the Debtor, Nemko, Inc., ("Nemko"), to determine the extent and validity of liens covering Nemko's accounts receivable.

Prior to filing for bankruptcy, Nemko was in the business of repairing buses and railway cars. In order to raise the capital needed to fund its operations. Nemko entered into a revolving loan agreement with UJB which also granted UJB a security interest in Nemko's inventory, equipment and accounts receivable ("the collateral"). In exchange, UJB agreed to lend Nemko an amount equal to 80% of Nemko's qualified accounts receivable. At that time, Nemko's principal place of business was located at 164 Konner Avenue, Pine Brook, New Jersey, in Morris County. UJB perfected its security interest in the collateral on April 16, 1986 by filing financing statements with the New Jersey Secretary of State and the Morris County Clerk's Office. The financing statements listed the Konner Avenue address. Upon being informed of Nemko's move to 346 Changebridge Road, also in Pine Brook, UJB filed amended financing statements listing the Changebridge Road address. In August of 1986, Nemko began leasing property at the Brooklyn Navy Yard, in Brooklyn, New York, where it converted buildings to a railcar and bus retrofit center as well as offices.

On February 6, 1989, the New York City Transit Authority ("NYCTA") awarded Nemko a contract to overhaul buses. In

1. The within discussion of the facts of this case is brief as this court has previously enunciated its findings of fact to a substantial degree in its earlier opinions. *Chase Manhattan Bank, N.A. v. Nemko, Inc. (In re Nemko, Inc.),* 136 B.R. 334 (Bankr.E.D.N.Y.1992),

*aff'd in part, remanded in part,* 202 B.R. 673 (E.D.N.Y.1996), *on remand to* 209 B.R. 590 (Bankr.E.D.N.Y.1997). This court incorporates its earlier findings of fact and supplements them where necessary.

order to arrange for government loans to cover improvements which Nemko was required to make to its existing facilities to perform the contract with NYCTA, it sought to obtain "bridge financing" from Chase. Nemko entered into a loan agreement with Chase and executed a security agreement granting Chase a security interest in the collateral. Chase filed the necessary financing statements required in governmental offices in New Jersey as well as New York. UJB participated in the negotiations between Nemko and Chase and acquiesced to Chase's demand that UJB subordinate its security interest in Nemko's equipment and inventory, but UJB retained a first priority position over Chase in regard to the accounts receivable.

Thereafter, events occurred which ultimately prevented Nemko from paying its bills as they matured and it was forced to file the petition for relief under Chapter 11 in this court on March 19, 1990.

On April 19, 1990, UJB filed an application by order to show cause together with a temporary restraining order to prohibit Nemko from using UJB's cash collateral consisting of proceeds derived from accounts receivable which was subject to UJB's lien. In opposition, Nemko filed a sworn affidavit of Dino Catozzo ("Catozzo"), Nemko's principal. The affidavit did not dispute the validity of UJB's lien but instead requested the court for authority to use $450,000.00 of UJB's cash collateral which Nemko needed to complete the work required of it under the NYCTA contract.

Counsel to UJB, Nemko and Chase were present when the application was heard at the hearing before this court to determine whether the court should grant the relief requested. Despite the affidavit of Catozzo, Nemko opposed UJB's application at the hearing by questioning the perfection of UJB's security interest in Nemko's accounts receivable. Counsel to Nemko asserted that once Nemko's retrofit operations at the Brooklyn Navy Yard became operational, there was an effective transfer of Nemko's chief executive office

from the Changebridge Road address to Brooklyn, New York. Thus, Nemko argued, the perfection of UJB's security interest in Nemko's accounts receivable lapsed due to UJB's failure to file a financing statement in New York as required by section 9–103(3)(e) of the Uniform Commercial Code. Chase did not take a position regarding Nemko's assertion but did argue that if Nemko was authorized to use cash collateral, Chase was entitled to adequate protection based on its own secondary security interest in Nemko's accounts receivable. Nemko did not dispute the validity of Chase's perfected security interest which was represented by filed statements in both Morris County, New Jersey and Kings County, New York. After hearing argument from all of the parties involved, this court ordered the parties to appear on April 27, 1990 and show cause why Nemko should not be prohibited from using cash collateral and further requiring Nemko to provide a full and complete accounting of its prepetition accounts receivable. Pending the April 27, 1990 hearing, the court authorized Nemko to use $15,000.00 of the banks' cash collateral.

Prior to the hearing, which had been adjourned on consent of the parties to April 30, 1990, Nemko filed a second sworn affidavit of Catozzo in opposition to UJB's application. In this second affidavit, Nemko continued to advocate the position that it had first raised at the April 19, 1990 hearing, namely that by the close of 1988, Nemko had effectively transferred its chief executive office from 346 Changebridge Road, Pine Brook, New Jersey to the Brooklyn Navy Yard in Brooklyn, New York. Catozzo also asserted that UJB had been fully aware of the move and had in fact consented to it. Nemko contended that it had transferred its chief executive office from New Jersey to New York and therefore UJB's lien was unperfected due to the fact that UJB had not filed a financing statement in New York.

In response to Catozzos' affidavits, UJB filed a "Memorandum of Law to Establish

Security Interest." The memorandum disputed Nemko's contention that Nemko had transferred its chief executive office by citing numerous facts which demonstrated that Nemko used the Brooklyn Navy Yard solely as an engineering facility while its office at 346 Changebridge Road, Pine Brook, New Jersey continued to function as its headquarters.

Prior to the hearing on the order to show cause on April 30, 1990, an agreement was reached between Nemko, UJB and Chase which the court later "so ordered" on the record at the hearing. The agreement authorized Nemko to immediately use $50,000.00 of the banks' cash collateral, with use of additional cash collateral to be determined at a future hearing. After several subsequent hearings, this court entered an order on July 12, 1990 directing the NYCTA to pay to Nemko $529,537.00 as an advance on the repair of eleven buses remaining under the contract. In exchange for their consent to Nemko's use of the banks' cash collateral to finish the repairs, the banks were given post-petition liens on all of Nemko's property. The issue of which bank's lien had priority in regard to Nemko's accounts receivable was left open pending the court's determination.

On July 27, 1990, UJB filed a motion to determine the validity of its lien. At the hearing on the motion, Nemko abandoned its previous position that it had transferred its chief executive office and recognized the first priority position of UJB's lien. UJB then sought to withdraw its motion. The court allowed UJB to withdraw the motion without prejudice to other parties to question the status of UJB's lien.

On February 27, 1991, Nemko and UJB filed a joint application to modify this court's July 12, 1990 order and to grant UJB relief from the automatic stay. The application sought court recognition of the fact that UJB held a first priority lien on Nemko's accounts receivable. It also requested authorization for Nemko, once it had possession of the funds, to turn over to UJB the receivables amounting to approximately $850,000.000 which would be due and owing from the NYCTA upon Nemko's completion of the bus contract. Before a hearing on the application could be held, however, Chase filed a complaint initiating the instant adversary proceeding against Nemko and UJB to determine the extent and validity of UJB's lien on Nemko's accounts receivable. The complaint adopted Nemko's prior position that Nemko had transferred its chief executive office from New Jersey to the Brooklyn Navy Yard and therefore the perfection of UJB's security interest had lapsed due to UJB's failure to file a financing statement in New York. Chase also filed opposition to Nemko and UJB's February 27, 1991 application arguing that until the adversary proceeding was resolved and the priority of UJB's lien determined, it was premature to grant UJB relief from the automatic stay.

On April 15, 1991, UJB filed a motion to dismiss Chase's complaint pursuant to Federal Rule of Bankruptcy Procedure 7012(b) or in the alternative for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056. UJB argued that because Chase was fully aware of UJB's prior financing statements at the time it entered into the security agreement with Nemko in May 1989. Chase lacked standing pursuant to section 9–401(2) of the Uniform Commercial Code to assert the priority of its security interest. Section 9–401(2) provides that the filing of a financing statement which is made in good faith but in an improper location is nevertheless effective against anyone with knowledge of the filing. In the alternative, UJB requested that it be granted summary judgment on the issue of whether Nemko had transferred its chief executive office from New Jersey to New York.

Chase filed a cross motion for summary judgment on October 18, 1991. This motion requested that the court grant Chase summary judgment on the issue of wheth-

er Nemko transferred its chief executive office to Brooklyn.

On January 16, 1992, this court entered an order granting UJB's motion to dismiss and denying Chase's motion for summary judgment. The court rejected Chase's strict interpretation of section 9–401(2), instead finding that even if Nemko had transferred its chief executive office from New Jersey to New York, the protections afforded by section 9–401(2) were broad enough to protect a creditor such as UJB. The court found that based on the subordination agreement between UJB and Chase, Chase was fully aware of UJB's prior filing when it entered into its security agreement with Nemko. Because there was no evidence that UJB's failure to file a financing statement in New York was due to bad faith, assuming, of course, that filing such a financing statement was necessary, section 9–401(2) preserved the priority of UJB's security interest. Chase filed an appeal.

In the meantime, Nemko had delivered the buses remaining under the NYCTA contract to the NYCTA, thereby fulfilling its obligations under the contract. The NYCTA deposited $738,629.00 into an escrow interest bearing account pending court direction as to who was entitled to the funds. Besides Chase's claim, several subcontractors also claimed entitlement to the funds. The subcontractors argued that pursuant to the terms of the NYCTA contract, all subcontractors claims had to be resolved and paid before the NYCTA could turn over any funds to Nemko. Because subcontractor claims existed, any funds owed by the NYCTA under the contract belonged to the subcontractors and were not property of the estate under 11 U.S.C. § 541(a).

In an opinion issued August 25, 1992, this court rejected the subcontractors' argument and found that any amount owed by the NYCTA to Nemko under the contract was property of the estate pursuant to § 541, except in regard to one of the subcontractors, upon which this court subsequently entered a separate decision. Nemko and the NYCTA agreed that at a minimum, $738,629.00 was due Nemko under the contract with an additional $108,911.00 in dispute. Because Chase had not sought a stay pending appeal of this court's January 15, 1992 decision, the court refused Chase's request that the NYCTA be prohibited from turning over this amount to Nemko for UJB's benefit until a decision on its appeal was rendered. The court did, however, authorize the NYCTA to withhold from paying Nemko $329,671.00 out of this amount pending the resolution of one of the subcontractors' claims, as hereinafter noted. The Debtor was directed to turnover the monies in question to UJB. In accordance with that decision, UJB received from Nemko $363,181.00 on October 28, 1992 and $286,075.00 on November 18, 1992, for a total of $649,256.00.[2]

On August 8, 1996, Hon. Sterling Johnson of the United States District Court for the Eastern District of New York, who heard Chase's appeal, entered an order that vacated this court's decision which had granted UJB's right to the accounts receivable. The District Court held that section 9–401(2) of the Uniform Commercial Code protects only those senior creditors who misfile an initial financing statement by filing in the wrong location and that section 9–401(2) is not intended to protect creditors who allow the perfection of their security interest to lapse under section 9–103(3)(e). Since the priority of UJB's lien was not preserved under section 9–401(2), the issue of which banks' security depended solely on whether Nemko transferred its chief executive office from New Jersey to New York. The case was remanded to this court for the sole determination as to whether Nemko trans-

---

**2.** Although UJB received the funds from Nemko, Summit, as the successor in interest of UJB is now the proper party in interest at this point. Therefore, further references as to what party received the funds will be to Summit.

ferred its chief executive office from New Jersey to New York as that term is used in section 9–103(3)(d) of the Uniform Commercial Code.

Following the District Court's decision, a hearing was held in this court on September 17, 1996. Counsel to UJB informed the court that its claim had since been transferred to Summit Bank, which then became the proper party in interest. Both parties agreed that an evidentiary hearing was not required and that the case should be submitted to this court for a final resolution on the submission of briefs. The court dispensed with the standards applicable to motions for summary judgment under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 and considered the matter as if a trial on the merits had been conducted.

After the conclusion of the hearing, both sides moved for judgment and the court granted Chase's cross-motion based upon an examination of the factors considered in determining the location of a debtor's chief executive office for the purposes of the Uniform Commercial Code. The court found that: (i) every key officer and employee of Nemko was working out of the Brooklyn Navy Yard by the close of 1988, (ii) Nemko had undertaken a concerted effort to portray itself to the public as a New York company by distributing information worldwide listing the Brooklyn Navy Yard as Nemko's address, and (iii) Nemko actually negotiated and dealt with its creditors at or from the Brooklyn Navy Yard. As a result of the transfer of Nemko's chief executive office and Summit's subsequent failure to file a financing statement in New York as required by section 9–103(3)(e) of the New York Uniform Commercial Code, this court held that Summit failed to preserve the priority of its security interest.

This court entered its order of July 2, 1997 granting Chase's motion for judgment. It made reference to the issue of prejudgment interest and provided "that Chase's entitlement, if any, to prejudg-

ment interest shall be determined, after a hearing, by further order of this Court."

On January 8, 1999, the District Court for the Eastern District of New York entered an order affirming this court's order of July 2, 1997. Summit filed a notice of appeal to the Second Circuit on or about February 5, 1999, but subsequently, by agreement with Chase, paid Chase the sum of $649,256 plus *post*-judgment interest. Chase executed a satisfaction of judgment reserving its right to seek prejudgment interest and Summit withdrew its appeal.

Chase filed the instant motion for summary judgment on the issue of prejudgment interest on April 16, 1999. Prejudgment interest in this instance is defined as interest accruing from the date Summit received possession of the funds from Nemko, $363,181.00 on October 28, 1992 and $286,075.00 on November 18, 1992, until July 3, 1997, the date of entry of the order of this court granting Chase's motion for summary judgment. Summit filed opposition papers and this court held a hearing on May 18, 1999. After hearing oral arguments by both parties, this court reserved decision pending memoranda of law to be submitted by both parties.

## MOTION TO AMEND JUDGMENT VERSUS MOTION FOR SUMMARY JUDGMENT

 Federal Rule of Civil Procedure 56, applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate where "there is no genuine issue as to any material fact" and where the movant would be "entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party moving for summary judgment has the burden of establishing the absence of material facts. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). In considering a motion for summary judgment, the court's role is not to resolve any

issues of material fact which are in dispute, but rather to determine if there are any factual issues necessitating a trial. *See Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993). Here, both parties acknowledge that there are no disputed issues of material fact which would require a trial. Instead, the parties' contentions are clearly legal in nature.

However, Summit argues that Chase's action is procedurally defective in that it should have filed a motion to amend the judgment of this court rather than a motion for summary judgment. Summit's papers detail how Chase's request for prejudgment interest fails to fall within Federal Rules of Civil Procedure 59(e)[3], 60(a)[4] and 60(b)[5], the relevant statutes for amending a judgment. A motion to amend a judgment, pursuant to Federal Rule Civil Procedure 59(e), must be filed no later than ten days after the entry of judgment. Summit argues that because Chase failed to file the instant motion within that time frame, Chase is precluded from seeking prejudgment interest. In addition, Summit argues that Chase failed to establish that there was any clerical mistake, for which Federal Rule Civil Procedure 60(a) would have allowed a correction to the order. Finally, it argues that even if Chase had demonstrated that there

was mistake, inadvertence, or excusable neglect under Federal Rule Civil Procedure 60(b), Chase was time barred by the one year time limit imposed under that rule. However, Summit's assertion that the issue of prejudgment interest could not be bifurcated from the main issue of this case by this court and therefore the motion for summary judgment was inappropriate is incorrect.

Summit contends that *Cinerama, Inc. v. Sweet Music, S.A.*, 482 F.2d 66 (2d Cir. 1973) supports its argument and its opposition. The Second Circuit, in *Cinerama*, tackled the question of bifurcating an award of interest. In that case, the court dismissed the motion for prejudgment interest on a loan guaranteed by *Cinerama* because the order awarding the initial judgment was not final and therefore not appealable. *Id.* at 72. The court stated that "the same operative facts that created the right to recover principal gave rise to the right to recover interest, there was but a single claim." *Id.* at 69. The lower court found that the guarantee in question was good and therefore the bank was entitled to summary judgment for the principal amount of the guarantee but the lower court had failed to award prejudgment interest. *Id.* at 68. The Second Circuit

3. Federal Rule of Civil Procedure 59(e), made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9023 states:

 **(e) Motion to Alter or Amend Judgment.** Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.
 FED.R.CIV.P. 59(e).

4. Federal Rule of Civil Procedure 60(a), made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9024 states:

 **(a) Clerical Mistakes.** Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed

in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.
 FED.R.CIV.P. 60(a).

5. Federal Rule of Civil Procedure 60(b), made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9024 states in pertinent part:

 **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; .... The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken.
 FED.R.CIV.P. 60(b).

found that the judgment was "an interlocutory summary judgment on the liability issue," which could not be executed on until prejudgment interest was determined. *Id.* at 72.

However, the instant case is distinguishable from *Cinerama* because the right to recover interest in *Cinerama* involved the same facts as the right to recover the principal arising under the guarantee. *Id.* at 69. In the case before this court, Chase is seeking interest for the time period Summit held money based upon the reversal by the District Court of this court's order which provided for judgment in favor of Summit, not upon the substantive issues of which entity was entitled to those funds in the first place. Therefore, *Cinerama* did not prevent this court from holding in abeyance the question of prejudgment interest until now.

Summit further cites in support of its argument *Paddington Partners v. Bouchard,* 34 F.3d 1132 (2d Cir.1994), *Lee v. Joseph E. Seagram & Sons, Inc.,* 592 F.2d 39 (2d Cir.1979), *Bernstein v. Lefrak (In re Frigitemp Corp.),* 781 F.2d 324 (2d Cir. 1986), and *Goodman v. Heublein, Inc.,* 682 F.2d 44 (2d.Cir.1982) for the proposition that the issue of prejudgment interest can not be bifurcated from the main issue before a court. Those cases are inapposite because, as in *Cinerama,* the basis for the award of prejudgment interest in each of those cases relies upon the same rights as the recovery of the principal. *See Paddington Partners,* 34 F.3d at 1139–41; *Lee,* 592 F.2d at 41; *In re Frigitemp,* 781 F.2d at 326; *Goodman,* 682 F.2d at 46. In the instant case, Chase's justification for an award of prejudgment interest is the reversal on appeal of this court's order that awarded Summit the funds. This clearly involves different rights than Chase's claim to the original funds that dealt with which party held the first priority lien on the accounts receivable.

This court clearly stated in its decision of June 9, 1997 that "[s]hould the parties desire, an evidentiary hearing will be scheduled to consider all legal and evidentiary issues concerning the amount of the NYCTA account receivable and Chase's entitlement, if any, to prejudgment interest." *In re Nemko,* 209 B.R. at 608. The order granting summary judgment pursuant to that decision, dated July 2, 1997, also states, "ORDERED, that Chase's entitlement, if any, to prejudgment interest shall be determined, after a hearing, by further order of this Court." In addition, the District Court, in affirming this court's decision in an order dated January 8, 1999, recited that this Bankruptcy Court's decision and order provided for, inter alia, the "(3) ordering that Chase's entitlement to prejudgment interest shall be determined, after a hearing, by further order of the Bankruptcy Court." The District Court made no mention of the inability of this court to bifurcate this issue of prejudgment interest. Bifurcating the issue of prejudgment interest was appropriate here since Chase did not receive possession of the funds until after this court's order was appealed and the parties subsequently settled. Only at this juncture is this court finally able to fix an amount of prejudgment interest because the time frame and decision involved is final.

■ Summit complains that Chase delayed in filing the instant motion. However, as Chase points out, it would not have made sense to bring this motion while the merits of the underlying judgment were still in controversy. Chase filed this motion three and one-half weeks after it was paid by Summit and Summit withdrew its appeal. This court finds that amount of time reasonable to file the instant motion. In addition, any delay was not detrimental to Summit as the time period for which Chase is seeking prejudgment interest ended on July 3, 1997. This is not a situation where Chase's delay caused any excess interest to accrue.

## DISCUSSION

■ Chase's statutory authority for its claim to prejudgment interest is provided

for by New York C.P.L.R. § 5001(a), which entitles it to receive prejudgment interest inasmuch as it was deprived by Summit of the use of the monies involved while Summit had the benefit of its possession and use. Section 5001(a) of the New York C.P.L.R. states:

> Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y.C.P.L.R. § 5001(a). Chase argues that Summit took possession of money pursuant to this court's decision and subsequent order which constitutes, in the language of § 5001(a), being *"because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of property."* N.Y.C.P.L.R. § 5001(a) (emphasis added). Therefore, Chase is entitled to interest for the period Summit had possession of the monies in order to make Chase whole. Chase does not that Summit took possession of this money with any wrongful intent, but that just the action of its taking possession of the funds deprived Chase of its use of its property. As a matter of equity, Chase contends that it was precluded from accruing interest on those funds and investing the same while Summit had the benefit of earning that interest and investing those funds. Thus, Chase argues, it should be able to recover the interest that it was precluded from earning.

In this case, the loss of the use of this money arose out of the order of this court which originally awarded judgment to Summit. None of the cases cited by either party deal with the situation peculiar to the facts of this case where the claim for interest pursuant to New York C.P.L.R. § 5001(a) due to the loss of property is the direct result of a court order. For example, in one of the cases cited by Chase, *Lewis v. S.L. & E., Inc.*, 831 F.2d 37, 41 (2d Cir.1987), the court awarded interest in a shareholder derivative action because the claim that the defendants wasted assets by causing another corporation to pay S.L. & E., Inc. less than fair and reasonable rent constituted interference with S.L. & E., Inc.'s enjoyment of its property. In *Spector v. Mermelstein,* 485 F.2d 474, 482 (2d Cir.1973), also cited by Chase, the court found that an award of prejudgment interest was mandatory where judgment was based upon an action for negligence and breach of fiduciary duty in convincing another party to lend money. Summit cites *A.I. Trade Finance, Inc. v. Petra Bank,* No. 89 CIV. 7987, 1997 WL 291841, at *6 (S.D.N.Y. June 2, 1997), a case where the court found that a mistaken wire transfer by the petitioner created the dispute and therefore the petitioner was not entitled to interest. Summit also cites *National Bank of Canada v. Artex Indus., Inc.,* 627 F.Supp. 610, 616 (S.D.N.Y.1986), in which the court did not award interest because the action was based upon the plaintiff's error in crediting an account which constituted an equitable action giving the court discretion to award interest pursuant to New York C.P.L.R. § 5001. Because it was the plaintiff's initial error that necessitated this litigation, the court found it would not be fair to have the defendant pay interest. *Id.* Based upon this court's research and the memoranda of law submitted by the parties, no reported case appears to address the facts peculiar to the instant case. namely the reversal of a court's order providing the basis for an award of prejudgment interest.

Chase's recovery of interest is based upon this court's order awarding the funds to Summit instead of to Chase and which order was subsequently reversed by the District Court. Absent any direct precedent to the contrary, it seems reasonable that as a matter of equity, this court should restore Chase to the position it

would have been in had it originally received the funds instead of Summit. This can be done by following the provision of New York C.P.L.R. § 5001(a) allowing the court discretion to award prejudgment interest in equitable matters, and 11 U.S.C. § 105(a) which allows the bankruptcy court to fashion remedies necessary "to carry out the provisions of this title." 11 U.S.C. § 105(a).

One case that strongly influences this court's decision, *United States of America v. National Westminster Bank USA (In re Q–C Circuits Corp.)*, 231 B.R. 506 (E.D.N.Y.1999), somewhat resembles the situation at hand. In *Q–C Circuits*, Hon. Melanie Cyganowski, U.S. Bankruptcy Judge, entered cash collateral orders which directed the Debtor to make adequate protection payments to National Westminster Bank ("the Bank"). *Id.* at 510. The Bankruptcy Court subsequently issued a decision, which the District Court affirmed, finding that the Internal Revenue Service ("IRS") was entitled to an accounting of funds paid by the Debtor to the Bank and directed the Bank to disgorge the funds and turn them over to the IRS to satisfy its tax lien. *Id.* at 510–13. The District Court then dealt with the issue of interest. *Id.* at 513. It is interesting to note that both parties in the instant case before this court look to the *Q–C Circuits* case in support of their respective arguments. However, Summit failed to address in its analysis of that case, that there are two different types of interest dealt with by the District Court. The District Court found that the Bankruptcy Court was correct in asserting that the IRS was over-secured and therefore it was allowed interest in fixing its claim. *Id.* Inasmuch as the Bankruptcy Court had failed to account for post-petition interest in its judgment, the District Court modified the decision to include that post-petition interest. *Id.* The District Court then dealt with a second issue of interest,

that of prejudgment interest, which is the subject of the instant case. The prejudgment interest discussed was the total amount due the IRS for the time period that the Bank had use and possession of the funds pursuant to the cash collateral order, which funds properly belonged to the IRS. *Id.* The District Court utilized the liberal equitable powers of the bankruptcy court pursuant to 11 U.S.C. § 105(a) which allows a bankruptcy court to issue any "order that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *Id.*

The *Q–C Circuits* District Court decision cites to the Second Circuit's case *Wickham Contracting Co. v. Local Union No. 3, Intern., Broth. of Electrical Workers*, 955 F.2d 831, 833 (2d Cir.), *cert. denied*, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992) for the factors used in awarding prejudgment interest. Those factors are: "(1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court." *In re Q–C Circuits Corp.*, 231 B.R. at 513–14 (citing *Wickham*, 955 F.2d at 833.) The Second Circuit awarded interest finding that "[w]here, as here, one creditor has had the use of funds that should have been paid to other claimants it has been held that prejudgment interest is proper." *Id.* at 514.

In the instant case, Summit had the possession and use of $363,181.00 from October 28, 1992 and $286,075.00 from November 18, 1992 until on or about February 5, 1999. Chase should have had the benefit of the funds during that time until the date of the entry of its, July 3, 1997.[6] Instead, by reason of this court's decision that was later reversed by the District Court. Summit reaped the reward of the use of those funds instead of Chase. An award of prejudgment interest is not a

---

6. Chase received post-judgment interest as a part of its settlement with Summit, therefore

Chase is not seeking interest beyond the entry of judgment date of July 3, 1997.

punishment for Summit as this court finds no wrongdoing in its actions. However, as a matter of equity and following the *Q–C Circuits* case, this court must make Chase whole by awarding prejudgment interest to it accruing from the date Summit received each transfer, $363,181.00 from October 28, 1992 and $286,075.00 from November 18, 1992, until July 3, 1997, the date of entry of this court's order awarding Chase the funds.

As for the rate of interest awarded, this court finds Chase's proposal of using 9% as an interest rate pursuant to N.Y.C.P.L.R. § 5004 to be too high in light of the facts peculiar to this case. Using its discretion, as provided by § 105 of the Bankruptcy Code and N.Y.C.P.L.R. § 5001(a), this court finds that a reasonable interest rate is 5%.

### CONCLUSION

(1) This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and it is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(k).

(2) The foregoing decision constitutes this court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

(3) Chase's motion for summary judgment is granted. This court awards Chase prejudgment interest at a rate of 5% accruing on $363,181.00 from October 28, 1992 to July 3, 1997 and on $286,075.00 from November 18, 1992 to July 3, 1997. Chase is directed to settle an order with sufficient exhibits to demonstrate its calculation of the interest as well as a separate judgment in conformity with the foregoing decision.